**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BANZAI ADVISORY GROUP, LLC, BANZAI CAPITAL PARTNERS, LLC, NEUGEBAUER FAMILY ENTERPRISES, LLC, AND TOBY NEUGEBAUER,<br><br>Plaintiffs,<br><br>v.<br><br>THE FOUNDERS FUND VII, LP, THE FOUNDERS FUND VII PRINCIPALS FUND, LP, THE FOUNDERS FUND VII ENTREPRENEURS FUND, LP, KERI FINDLEY, CASON CARTER, BRITT AMOS, JEROME T. FADDEN, MANUEL RIOS, SEVEN TALENTS, LLC, J. NICHOLAS AYERS 2021 IRREVOCABLE TRUST, AYERS FAMILY HOLDINGS LLC, VIVEK RAMASWAMY INVESTMENTS LLC, JACKSON INVESTMENT GROUP, LLC, GFNCI, LLC, DESCANTE CAPITAL, LLC, AND THE LONSDALE FAMILY REVOCABLE TRUST DATED FEBRUARY 15, 2018,<br><br>Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 24-_____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

The Plaintiffs, through their creation of and investment in With Purpose, Inc. d/b/a GloriFi ("GloriFi"), assimilated a highly valuable portfolio of intellectual property associated with the creation of a new nationwide financial services company.  The Defendants (and their individual owners), after reviewing Plaintiffs' proprietary intellectual property, wanted GloriFi's concepts, but were bound by signed agreements protecting GloriFi's trade secrets, proprietary information, and confidential information.  Owning less than 20% of the Company, Defendants (and their individual owners) set in motion a comprehensive plan to gain control by making the Company un-investable for anyone but themselves through a blitzkrieg campaign of defamation and disparagement about the company's CEO and largest shareholder, Toby Neugebauer.  When their takeover attempt failed,

1

Defendants (and their individual owners) worked together to brazenly steal GloriFi's intellectual property (in violation of their contractual obligations and applicable law) on behalf of competitive companies they formed or invested in and, in doing so, destroyed a multi-billion dollar company and caused harm to Plaintiffs. Accordingly, Plaintiffs file this lawsuit to recover damages to themselves and damages resulting from Defendants' breaches of contract and related conspiracy.[1]

## PARTIES

1.      Plaintiff Banzai Advisory Group, LLC is a Texas LLC with its principal place of business at 11700 Preston Rd., Ste. 660-394, Dallas, Texas 75230.

2.      Plaintiff Banzai Capital Partners, LLC is a Texas LLC with its principal place of business at 11700 Preston Rd., Ste. 660-394, Dallas, Texas 75230. Collectively, Banzai Advisory Group, LLC and Banzai Capital Partners, LLC are the "Banzai Entities."

3.      Plaintiff Toby Neugebauer is an individual residing in Texas.

4.      Plaintiff Neugebauer Family Enterprises, LLC ("NFE") is a Texas LLC with its principal place of business at 11700 Preston Rd., Ste. 660-394, Dallas, Texas 75230. Collectively, Toby Neugebauer, Neugebauer Family Enterprises, LLC, Banzai Advisory Group, LLC, and Banzai Capital Partners, LLC are the "Neugebauer Parties."

5.      Defendant The Founders Fund VII, LP is a Delaware limited partnership with its principal place of business at 1 Letterman Dr., Bldg. D. 5th Flr, San Francisco, CA 94129. It may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

6.      Defendant The Founders Fund VII Entrepreneurs Fund, LP is a Delaware limited

---

[1] Plaintiffs do not seek any lost equity value in GloriFi or any other damages property of the GloriFi Bankruptcy Estate.

partnership with its principal place of business at 1 Letterman Dr., Bldg. D. 5th Flr, San Francisco, CA 94129.  It may be served through its registered agent, The  Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

7.     Defendant The Founders Fund VII Principals Fund, LP is a Delaware limited partnership with its principal place of business at 1 Letterman Dr., Bldg. D. 5th Flr, San Francisco, CA 94129.  It may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.  Collectively, The Founders Fund VII, LP, The Founders Fund VII Entrepreneurs Fund, LP, and The Founders Fund VII Entrepreneurs Fund, LP will be referred to as "Founders Fund."

8.     Defendant Britt Amos is an individual residing at 3346 Valley Rd NW, Atlanta, Georgia 30305.

9.     Defendant Cason Carter is an individual residing in Illinois.  He may be served at his regular place of business, 200 S. Biscayne Blvd., Miami, FL 33131.

10.    Defendant Keri Findley is an individual residing in Austin, Texas.  She can be served at her regular place of business, 2505 Pecos St., Austin, Texas 78703.

11.    Defendant Jerome T. Fadden is an individual residing at 120 Starfire Dr., Dripping Springs, Texas 78620.

12.    Defendant Manuel Rios is an individual residing at 5434 East Galbraith Rd., Cincinnati, Ohio 45236.

13.    Defendant GFNCI LLC is a Delaware LLC with its principal place of business at 131 South Dearborn St., Chicago, Illinois 60603.  It may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. GFNCI LLC is operated and/or controlled by Citadel LLC and is referred to herein as the "Citadel

3

Investment Entity."

14.     Defendant Ayers Family Holdings LLC is a Georgia limited liability company with its principal place of business at 3290 Northside Pkwy, Ste. 675, Atlanta, GA 30327.  It may be served through its registered agent, James Nick Ayers, at the same address.

15.     Defendant J. Nicholas Ayers 2021 Irrevocable Trust is a Trust with its principal place of business at 3290 Northside Pkwy, Ste. 675, Atlanta, GA 30327.  It can be served through its Trustee, Nick Ayers at 3290 Northside Pkwy, Ste. 675, Atlanta, GA 30327.  Ayers Family Holdings LLC and J. Nicholas Ayers 2021 Irrevocable Trust are controlled by Defendant Nick Ayers and referred to collectively as the "Ayers Investment Entities."

16.     Jackson Investment Group, LLC is a Georgia LLC with its principal place of business at 2655 Northwinds Pkwy, Alpharetta, GA 30096.  It may be served through its registered agent, Shane Jackson at 2655 Northwinds Pkwy, Alpharetta, GA 30009.  Defendant Rick Jackson controls Jackson Investment Group, LLC and it is referred to herein as the "Jackson Investment Entity."

17.     The Lonsdale Family Revocable Trust dated February 15, 2018 may be served through its Trustee, Joseph Lonsdale at his regular place of business, 907 South Congress Ave., Austin, Texas 78704.  The Lonsdale Family Revocable Trust dated February 15, 2018 is controlled by Defendant Joseph Lonsdale and referred to herein as the "Lonsdale Investment Entity."

18.     Descante Capital, LLC is a Georgia LLC with its principal place of business at 3340 Peachtree Rd., Ste. 2900, Atlanta, GA 30326.  It may be served through its registered agent, Cogency Global Inc., 900 Old Roswell Lakes Pkwy. Ste. 310, Roswell, GA 30076.  Descante Capital, LLC is controlled by Defendant Jeff Sprecher, and it is referred to herein as the "Sprecher Investment Entity."

4

19.     Defendant Vivek Ramaswamy Investments LLC is a limited liability company with its principal place of business at 9172 West Meadow Dr., West Chester, OH 45069.   Vivek Ramaswamy controls Vivek Ramaswamy Investments LLC and it is referred to herein as the "Ramaswamy Investment Entity."

20.     Seven Talents, LLC ("Seven Talents") is a Georgia LLC with its principal place of business at 3290 Northside Pkwy, Ste. 675, Atlanta, GA 30327.  It may be served through its registered agent, Tabitha Regan, at 7000 Central Pkwy., Ste. 1100, Atlanta, GA 30328.

## DEFINITIONS

21.     Collectively, Citadel, Rick Jackson, Joe Ricketts, Jeff Sprecher, and Peter Thiel are the "Billionaires."

22.     Collectively, Nick Ayers, Vivek Ramaswamy, Joe Lonsdale, Findley, Carter, and Amos are the "Billionaire Agents."

23.     Collectively, the Citadel Investment Entity, Founders Fund, Ayers Investment Entities, Jackson Investment Entity, Lonsdale Investment Entity, Sprecher Investment Entity, Ramaswamy Investment Entity, and GFNCI, LLC are the "Defendant Investment Entities."

24.     Collectively, Strive Asset Management, LLC, Strive Enterprises, Inc., Coign, Old Glory Holding Company, and Old Glory Intellectual Property Holdings, LLC are the "Competitor Entities."

25.     Collectively, the Billionaires, Billionaire Agents, Defendant Investment Entities, Competitor Entities, Seven Talents, LLC, Manuel Rios, Jerome Fadden, Breanne Harmsen, and Jonathan Pennington are the persons that conspired together to form the "RICO Enterprise."[2]

---

[2] Certain members of the RICO Enterprise are not Defendants here, but are defendants in the Georgia Action, as most of them reside in Georgia.

**NATURE OF THE CASE**

26.     Shareholder Agreements play a critical role in private equity ("PE") and venture capital ("VC") investing.  To mitigate risk or due to capital intensity, PE and VC come together to jointly invest in our country's emerging companies and more established larger companies.  VC and PE investing is a multi-trillion-dollar industry subject to some state and federal laws, but it is mostly regulated by the agreements between investors, both debt and equity, and management teams of the VC and PE backed companies.  The rules of behavior outlined in those agreements are critical to both: (1) the decision-making process of investors in choosing whether to risk their capital; and (2) executives in choosing to risk their careers on a new venture.  As some of the most active investors in the United States, the Defendants, as a critical part of their daily operations, utilize these exact types of agreements to protect their intellectual property and the reputations of the companies they own and/or operate.  The Defendants aggressively litigate and prosecute any perceived violations of such agreements.

27.     Similarly to how Defendants protect their own intellectual property, GloriFi required Defendants (or their Defendant Investment Entities) to sign a confidentiality agreement (the "NDA") before getting access to GloriFi's data room, then a Confidentiality and Proprietary Rights Agreement (the "Proprietary Rights Agreement") and a Stockholders Agreement (the "Original Stockholders Agreement," an example of which is attached hereto as Exhibit A, and the "Amended and Restated Stockholders Agreement," an example of which is attached hereto as Exhibit B, are, collectively, the "Stockholders Agreement") upon investing.  Multiple agreements are often utilized so that there is no ambiguity about what intellectual property is owned by the company and how shareholders are supposed to behave in relationship to each other and the company.  Plaintiffs NFE, Neugebauer, and the Banzai Entities are also parties to the Stockholders Agreement, which required

Defendants to avoid disclosing GloriFi's "trade secrets, proprietary information, or confidential information."

28.     Specifically, pursuant to § 5.04(e) of the Amended and Restated Stockholders' Agreement, all investors agreed:

> not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other Stockholders or stockholders of an Affiliate of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company Group

29.     The Amended and Restated Stockholders Agreement broadly defines "<u>Confidential Information</u>" to include "confidential, secret, and proprietary documents, materials, data, and other information, in tangible and intangible form, of and relating to the Company and its Affiliates, businesses and existing and prospective customers, suppliers, investors, and other associated third parties."   Additionally, under § 5.03(c) of the Original Stockholders Agreement, the Ayers Investment Entities, Founders Fund, Rios, and Fadden were prohibited from engaging in any "activity in which the Stockholder contributes the Stockholder's knowledge, directly or indirectly, as an … owner, … advisor, … director, stockholder, … or any other similar capacity to **<u>an entity … engaged in a business with a similar customer-acquisition strategy</u>**."   It also prohibited the same persons from engaging in "any activity that may require or inevitably requires **<u>disclosure of trade secrets, proprietary information, or confidential information</u>**."

30.     Further, under §5.04(d) of the Stockholders Agreement, each stockholder agreed that they would not "communicate to any person … any defamatory or disparaging remarks … concerning the Company Group … or any of its … officers, … investors and other associated third parties."   Defendants violated both sections of the Stockholders Agreement in pursuit of GloriFi's

intellectual property and Plaintiffs seek to recover their damages[3] resulting from such breaches.

31.     Because Defendants only owned 20% of GloriFi (through their Defendant Investment Entities), a much lower percentage than they normally control, they ignored or deliberately disregarded the contractual and legal obligations under the very agreements that allow them to protect their own portfolio companies.  Defendants coveted GloriFi's intellectual property and put in motion a calculated plan to take it.  This lawsuit seeks redress for their tortious actions in violation of their contractual and legal obligations.

## JURISDICTION AND VENUE

32.     Jurisdiction in this Court is proper because Plaintiffs bring federal causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).  All Defendants are subject to Delaware jurisdiction either because they are incorporated in Delaware or because they consented to the jurisdiction of this Court pursuant Section 7.12 of the Original Stockholders Agreement and Section 9.12 of the Amended & Restated Stockholders Agreement.

## BACKGROUND AND SUMMARY OF ALLEGATIONS

33.     In the last decade corporations across America shifted their primary focus from enhancing shareholder value to environmental, social, and governance ("ESG") initiatives, going so far as to "score" companies on their ESG competency.  Multi-trillion-dollar investment managers, such as Blackrock and Vanguard pressured company Boards of Directors to make business decisions on ESG factors rather than economics.

34.     In contrast, Neugebauer and his team founded GloriFi by appealing to a community

---

[3] Plaintiffs are not seeking to recover damages to GloriFi itself resulting from the violations of the Stockholders Agreement (including any Plaintiff's lost equity value) as the GloriFi Bankruptcy Estate must pursue such claims.

of hard-working, value-driven Americans frustrated by ESG.   In its marketing, GloriFi noted, "Americans are tired of being told. We are tired of being told. Told by Wall Street and big tech what's wrong with America — and why we are the problem."  GloriFi targeted a demographic that wanted to save, spend, and insure through a purpose-driven platform, owned and operated by people who share their values of faith, family, and free enterprise.  As Neuegbauer explained: "It is about the friends I grew up with that played football under 'Friday Night Lights.' And they don't feel loved. They don't feel respected."[4]

35.     GloriFi's Mission Statement and Core Values were presented in its marketing materials from the very beginning:



36.     "We the People."   The first three words of the preamble to the United States Constitution.  Words taught to every American child.  Words that automatically invoke patriotism and reverence for the founding of this great country.  GloriFi's target demographics—pro-family, pro-faith, pro-capitalism, gun owners, patriots, and other hardworking Americans alienated by

---

[4] https://www.bankingdive.com/news/neobank-GloriFi-shuts-down-anti-woke-conservative-bank-esg/637197/.

liberal Wall Street policies—would all embrace "We the People" as the antithesis of "woke" and "ESG." This patriotic message was also an integral part of GloriFi's marketing materials:




CONFIDENT


INDEPENDENT

COURAGEOUS


GENEROUS

37. GloriFi's research showed that this 100-million-person demographic would be the ideal financial services customer. Their loss ratios were the best in home and auto insurance; they were savers looking for financial products to fund their children's educational aspirations, they paid their bills with above average credit scores, and they were hard working Americans with above average income. GloriFi's data showed that this target group was looking for alternative financial institutions, presenting an extraordinary opportunity to capture the most valuable financial services

customer at a low cost.



38.     The Defendants, by virtue of their status in the financial and political worlds, were unparalleled in their ability to recognize and fully appreciate the magnitude of the GloriFi opportunity.   After reviewing GloriFi's confidential data room and associated material, each potential investor, many of them billionaires, immediately recognized the extraordinary and exceptional potential of GloriFi's concepts.   Familiar with each other through an interconnected web of business and political interest coordinated by subordinates including Cason Carter, a Citadel attorney and its point man in D.C., Nick Ayers, Citadel's hired political operative as well as Vice President Mike Pence's former Chief of Staff, and Keri Findley, who reports directly to Peter Thiel while overseeing his financial liquidity.   These individuals routinely co-invest in political action committees, politicians, causes, and business ventures.   In addition, Ayers's friends from Atlanta (Seven Talents) and two GloriFi employees (Rios and Fadden) were pressured by the leaders of the RICO Enterprise and played supporting roles, as they were along for the ride with the richest most powerful people in America.

39.     Now, there is a hierarchy within the group of incredibly high achievers connected to

GloriFi, with Citadel/Ken Griffin, Peter Thiel, legendary technology investor and founder of PayPal, and Jeff Sprecher who, through his company, InterContinental Exchange owns the New York Stock Exchange, at the top.  Carter reported directly to Ken Griffin, CEO of Citadel, and Citadel was Ayers's greatest source of income and, just as importantly, source of clout.  On critical occasions, Ayers let GloriFi Board members and GloriFi corporate counsel know that certain decisions were being made above him.  Vivek Ramaswamy would repeat over and over that he needed to align with Citadel and Carter as he wanted Griffin to fund his upcoming campaign for President of the United States.

40.    As one of the most famous and successful technology investors in the world, Thiel had similar influence as Citadel.  Findley served as Thiel's agent in GloriFi as Thiel was her primary source of income as a manager of investments for Thiel and his husband, Matt Danzeisen. Likewise, Lonsdale's renown came from his involvement with Thiel in connection with Palantir Technologies Inc.  In this cabal, none of the individual Defendants' actions would have occurred but for the support at the top of this hierarchy.

41.    Based on their experience, expertise, and comparable valuations of other financial technology companies at the time, such as Chime and Citadel customer Robinhood Markets, Inc., Defendants estimated GloriFi as a potential $60 billion company in the future and coveted the chance to get in on the ground floor.  However, while Defendants had high expectations for GloriFi, they did not anticipate the speed of GloriFi's growth.  GloriFi's valuation skyrocketed, quickly exceeding $1 billion before Defendants could obtain more than a small non-controlling ownership interest of less than 20%, a small fraction compared to the ownership interest they normally demand.

42.    Defendants were determined to increase their ownership and control and started a

well-thought-out plan.  <u>First</u>, they made "Trojan Horse" initial investments in the form of convertible debt.  <u>Second</u>, through a premeditated side letter thrust upon GloriFi the day before Thanksgiving—waiting until the last possible moment to demand this significant change as the financing round was scheduled to close Friday—they obtained the right to block any subsequent GloriFi capital raise subject to certain conditions.  <u>Third</u>, they sought to put their people in senior leadership roles at GloriFi such as Chief Executive Officer, Head of Human Resources, Chief Financial Officer, and members of the Board of Directors, while at the same time attempting to sew dissension within the ranks of the existing GloriFi management team.  <u>Fourth</u>, they promised to keep funding GloriFi without any intention of doing so—unless they could obtain control—then launched a campaign to block competing sources of capital.

43.     The Defendants' plan almost worked, but the Plaintiffs outmaneuvered the Defendants, by obtaining additional funding in April 2022, converting Defendants' debt to equity, and removing Defendants' special Side Letter blocking rights.

44.     With their typical investment strategy thwarted, Defendants faced a challenging predicament.  They wanted to replicate GloriFi's concepts, but they had signed agreements protecting GloriFi's trade secrets, proprietary information, and confidential information, so they could not simply compete in the marketplace.  Therefore, Defendants tried to derail GloriFi by creating a series of liquidity crises through a protracted campaign of defamation and disparagement to the Company's auditors, merger partners, corporate counsel, investment bankers, and potential investors, focused mainly on its CEO and largest shareholder, Neugebauer.

45.      Meanwhile, as a hedge to the hostile takeover, the Defendants formed competing companies and stole GloriFi's intellectual property and marketing strategy for themselves, counting on GloriFi's inability to protect its intellectual property due to its liquidity problems.  Defendants

13

or people associated with them created Coign, Strive,[5] and Old Glory, by utilizing GloriFi's Confidential Information including, but not limited to, its customer acquisition strategy—in violation of Defendants' obligations under the Stockholders Agreement—and also relied on GloriFi's other trade secrets, proprietary information, and confidential information.

46.     For instance, acting through Strive, Ramaswamy and Defendants conspired to steal GloriFi's forthcoming portfolio of anti-woke exchange traded funds ("ETFs") starting with the energy sector.  Known internally as "WhiteRock," GloriFi's CEO offered Ramaswamy 30% of ownership in Project WhiteRock to be its CEO.  Ramaswamy turned down the offer and, while GloriFi was laying the legal groundwork and searching for a CEO for "WhiteRock", the Defendants used their vast resources to steal GloriFi's intellectual property and form Strive with Ramaswamy as its face: a significant part of his resume as to why he should become the 47th President of the United States.

47.     Similarly, the Defendants and others used Coign to steal GloriFi's "We the People" tagline and its credit card design:



48.     Quite simply, Defendants and others conspired together to violate the terms of the

---

[5] Strive Asset Management, LLC and Strive Enterprises, Inc. will be referred to collectively as "Strive."

Stockholders Agreement and other GloriFi contracts to enable them to misappropriate GloriFi's intellectual property.  The Conspirators were not content to simply steal a credit card design and an ETF concept, but the entirety of a $1.65 billion business enterprise through competitors Coign, Old Glory, and Strive.  In fact, Ramaswamy publicly confirmed that Strive intends to occupy the entirety of GloriFi's space in the financial ecosystem, stating that Strive is "going to be expanding to other financial service verticals one at a time. Asset management is where we started. Wealth management is next. Coming up banking, mortgages, investment banking. All in our long term future."  And all based on GloriFi's confidential information, proprietary information, and trade secrets.

49.     GloriFi's Board of Directors began the process of redress by suing Ayers and other co-conspirators in an Arbitration back in June 2022, that is now proceeding as part of GloriFi's Bankruptcy Estate.  Now Plaintiffs sue to enforce their rights under the Stockholders Agreement and corresponding breaches of law and recover their lost income, reputational and other damages inflicted on them by the wrongful acts and conduct of the Defendants, as described below and discussed herein.

## FACTS

### A.     The Founding of GloriFi: an Anti-Woke Financial Institution

50.     In the financial crisis, the best performing credit portfolio was that of the famed outdoor retailer Cabela's.  Cabela's credit card customers were hardworking, law-abiding individuals, who diligently save for retirement and maintain their homes and automobiles.  They represent a demographic often overlooked and even looked down upon by Wall Street. Many of these Americans desperately want to work with investment management companies, banks, and other financial institutions that make investment decisions solely based on economics, not

Corporate Equality Index and ESG scores.  Recognizing this gap in the market, in January 2021, Toby Neugebauer began creating a company to provide insurance, banking, investment, and credit card services to more than 100 million disenfranchised patriotic Americans.

### GLORIFI

## Marketing Website Homepage



51.     Neugebauer and Mike Pence's former Chief of Staff, Nick Ayers, had previously worked on a few business deals together.  On a hunting trip in South Texas the week of the January 2021 Presidential Inauguration, Nick Ayers shared with Neugebauer that he and Citadel were going to invest in a significant media vehicle to effectuate change, such as buying out CNN or another major media publication.  In response, Neugebauer shared the GloriFi vision, which he saw as a more significant opportunity—both to empower "the people" and to create wealth.  They agreed to meet again to allow Neugebauer to share his team's extensive research on evaluating the feasibility of such a big undertaking.  Ayers brought political consultant Zac Moffatt and other principals of Seven Talents, LLC to Aspen, Colorado to brainstorm about the business with Neugebauer on February 2, 2021.  Ayers wanted to name the new company Old Glory, while Neugebauer favored

16

a more unique name.  Either way, the Company's marketing would focus on patriotic themes including "God and Country," "Freedom and Independence," and the iconic "We the People."

52.     On or around March 18, 2021, Neugebauer and Ayers traveled to Florida to meet with key insurance executives, followed by dinner with Florida Governor Ron DeSantis.  At that time, Ayers argued that GloriFi's planned business was too risky because of "cancel culture" attacks on conservative businesses, specifically by the West Coast tech community, whose support would be required to execute on the technology.

53.     Unbeknownst to Neugebauer, while downplaying the concept to Neugebauer, Ayers and/or persons known to him formed an entity called Old Glory Holdings, LLC ("Old Glory") on March 12, 2021, through attorney Michael P. Ring.  Old Glory's principal office was located at 3350 Riverwood Parkway, Suite 1900, Atlanta, Georgia 30339, just upstairs from the offices of the J. Michael Gearon Foundation (Ste. 425), where Ayers hosted GloriFi meetings.  With Old Glory formed, Ayers became much less involved with GloriFi, although he continued to phone in occasionally to hear updates.

54.     Meanwhile, the legal GloriFi entity was formed on May 5, 2021.  GloriFi officially launched operations on June 1, 2021, in Dallas, Texas, with Neugebauer's family initially as the sole owner.

55.     By late June, in a major step forward, through another entity, Neugebauer and his wife, Melissa, secured a contract to acquire a Texas bank, Citizens Bank of Ganado, which would come under the GloriFi umbrella both contractually and with the GloriFi investors having the right to invest.

56.     GloriFi initially sought the wisdom and experience of: Miles Everson, former Chair of PwC Consulting (a leader in advising the nation's largest financial institutions) and Andy Main,

former head of Deloitte Digital and CEO of Ogilvy (a global leader in online customer experience), who would frame up the goal, the people and the tools required to achieve it, before bringing in senior executives from Bank of America and many more of the nation's largest financial services. This group of financial services executives, each with decades of experience in compliance and control, treasury, underwriting, dispute resolution and claims, had worked with the country's biggest and most complicated financial services companies.

57.     Plaintiffs wanted to create a best-in-class company in the most important sector in the world - financial services.  GloriFi intended to create an experience for its customers so good that it would also attract customers outside its target demographic who were also seeking a world-class experience in financial services. The marketing materials outlined the investment thesis:



58.     Plaintiffs believed this large target demographic would allow them to solve some of the biggest issues with startup digital financial services companies: customer acquisition cost and the quality/profitability of each individual customer.   Activist actions by the Nation's largest

financial institutions had alienated this target group, creating an enormous opportunity to convert customers without the typical burdensome high customer acquisition cost.  In fact, GloriFi saw an opportunity to create a massive network effect, like Facebook and Netflix, which would allow GloriFi to grow exponentially with dramatically lower customer acquisition costs.   In addition, more traditional corporations did not advertise on the media outlets or hire the influencers that appealed to GloriFi's large target market, leading to a significant underpricing of these media outlets and influencers relative to their economic impact.

59.     Furthermore, Plaintiffs believed they had the opportunity to build the most modern technology platform in financial services. Pre-existing cobalt-based technology systems utilized by big banks are antiquated, difficult to operate, and expensive to maintain.  GloriFi would offer customers a next-generation user experience, with back office and compliance functionality in the cloud — a technological quantum leap forward creating an all-encompassing business platform akin to the seamless services provided by industry giants like Amazon and Netflix.  From a financial standpoint, GloriFi zoned in on making as much of its technology cost variable as possible, meaning the Company would only incur expenses when generating revenue thus reducing the cash burn that plagues so many early-stage companies.

60.     Understanding the incredibly complex regulations imposed on financial services companies, GloriFi gathered a team well-versed in the inner workings of banks, insurance companies, credit card companies, and broker-dealers, and paired them with talented young people to create the best all-in user and back-office experience.  This team created a whole new technology stack that gave GloriFi the most intuitive customer interface, operating at unheard-of speed and efficiency, targeting new account openings in thirty seconds.  By building from the ground up utilizing software created by leading edge companies, GloriFi constructed its technology platform

19

at a fraction of the time and upfront cost as other aspiring financial services companies.

61.     By September 2021, GloriFi employed or contracted with roughly 100 people with centuries of collective experience working on insurance, banking, and credit card businesses for the nation's largest financial institutions.  Neugebauer met with Joe Lonsdale, managing partner at 8VC and co-founder of Palantir Technologies Inc., in July 2021 and Lonsdale expressed an interest in investing in GloriFi.  Similarly, on September 17, 2021, billionaire Peter Thiel, former CEO of PayPal, told Neugebauer on a Zoom call that GloriFi was the "best idea you will ever have" and indicated that his Founders Fund had an interest in investing.  Later in September 2021, Lonsdale made a $500,000 investment through the Lonsdale Investment Entity.  On investing, Lonsdale signed an NDA, a Proprietary Rights Agreement, and a Stockholders Agreement.  Recognizing the enforceability of those agreements, he deleted the non-competition section citing "technical" issues with his Venture Capital funds. In hindsight, Lonsdale's reticence to agree to a non-competition clause should have been a red flag for Neugebauer.  Then, Peter Thiel and Scott Nolan, the CEO of Founders Fund, committed to a $2.5 million investment and, on behalf of Founders Fund, signed the Stockholder Agreement in its complete form—without removing any non-competition language.  At that point, Neugebauer was only looking for $25 million from outside investors and wanted Founders to be 10% of the raise.

**B.     GloriFi Hires Nick Ayers to Raise Capital**

62.     After learning of Thiel's decision to invest in GloriFi, Ayers enthusiastically re-engaged with the Company. However, by this point, GloriFi had progressed significantly beyond the mere conceptual stage envisioned by Neugebauer.  Due to GloriFi's progress and the caliber of its management team, Ayers' Investment Entities signed the Stockholder Agreement, NDA, and Proprietary Rights Agreements. Additionally, Ayers became President of GloriFi while receiving a

3% equity stake, much less than Neugebauer initially offered Ayers in early 2021.   GloriFi hired Ayers to lead capital fundraising and help with customer acquisition as he had both experience and contacts from his previous work leading the Republican Governors Association.

63.     On October 20, 2021, Ayers set up a meeting in the Atlanta Peachtree Airport in DeKalb County between Neugebauer, Vivek Ramaswamy, author of Woke, Inc. and future United States Presidential candidate, and Cason Carter, a senior Citadel executive and lawyer who reports directly to Ken Griffin as Citadel's head of Public Affairs and its point man in D.C.  Carter said Citadel would invest and enthusiastically asked to become GloriFi's general counsel.  Carter said Citadel was in the process of moving its headquarters to Florida and he believed timing was right for Griffin to consider allowing him to move to GloriFi.  Neugebauer did not believe that Carter had the appropriate financial services experience for the role.  Ramaswamy and Ayers immediately lobbied to visit Neugebauer and, at that Dallas meeting, Ramaswamy indicated that he wanted to invest in GloriFi and become its co-CEO because he saw GloriFi as a potential $60 billion company and a platform from which he could launch his presidential campaign.

64.     On October 21, 2021, Neugebauer met with Jeff Sprecher, CEO of the Intercontinental Exchange, the owner of the New York Stock Exchange and many other exchanges around the world, his wife, former Senator Kelly Loeffler, Jimmy Blanchard, Vice Chairman of Augusta National Golf Club and pioneer of credit cards and banking, and J. Michael Gearon, part owner of the Atlanta Hawks.  All four indicated a strong interest in investing in GloriFi.  Likewise, Neugebauer had a Zoom conference with Rick Jackson, Atlanta billionaire and CEO of Jackson Healthcare, who also expressed interest in investing. To accommodate their investment, Neugebauer explained that he would need to reduce the investment of his close friends, who were some of the most successful energy owners in the country. Neugebauer was clear in his discussions

21

with Citadel, Thiel, Lonsdale, Sprecher, Ramaswamy, Jackson, and others that they would need to provide support to GloriFi beyond just capital investment if he was going to reduce his friends' investment.

**C.     Neugebauer Shares "WhiteRock" by GloriFi with Ramaswamy and Ayers**

65.     While Neugebauer was passionate about GloriFi's consumer business, GloriFi's small business and ETF platform were his favorite parts of GloriFi's future because they paired GloriFi's consumer strategy with Neugebauer's two decades of success raising and investing money on behalf the country's largest institutional investors such as state pension plans, insurance companies, colleges, and endowments.  ETFs are "exchange traded funds" that mirror a particular index or industry.  While BlackRock and Vanguard, the largest trillion-dollar ETF managers, made ETF investments based on ESG scores, "WhiteRock" (the antithesis of Black Rock) would focus purely on economics.

66.     "WhiteRock" would start with energy ETFs, driven by concerns over liberal attacks on the oil industry. Furthermore, Neugebauer possessed an extensive background in Energy Private Equity with decades of experience generating exceptional returns investing in energy on behalf of the world's largest institutional investors as the co-founder of one of the largest energy private equity firms in the world, Quantum Energy Partners.  With Quantum, Neugebauer successfully raised money for energy investing from State-owned retirement plans in Florida and Texas for fire fighters and police officers—investors that would be perfect customers GloriFi's ETFs. Neugebauer believed conservative states would have an interest in ETFs that voted shares in a conservative manner, not based on ESG factors and instructed Ayers to look at strategies to highlight this forthcoming portfolio of ETFs with legislatures and Governors throughout the south.

67.     In October and early November 2021, Ramaswamy and Ayers lobbied Neugebauer

to bring Ramaswamy on board in an executive capacity.  Ramaswamy also disclosed that he wanted to create his own hedge fund focused on active money management.  Neugebauer did not see Ramaswamy as the right fit to lead GloriFi, but thought he might be perfect to serve as the public face of WhiteRock.

68.     On November 2, 2021, Neugebauer offered Ramaswamy 30% of WhiteRock to become its CEO.  Neugebauer told Ramaswamy that WhiteRock would not be in the business of picking stocks, like his planned hedge fund, but would be an "anti-woke ETF."  Neugebauer explained that Ramaswamy's hedge fund had limited ability to grow because it was capped at the number of people who thought he could deliver above market rates of returns over long periods of time, while the WhiteRock ETF business would have much broader acceptance, providing Ramaswamy an excellent platform for his presidential campaign.

69.     Vanguard and BlackRock were two of the largest proponents of ESG investing, with trillions of dollars invested in their ETFs.  Neugebauer explained WhiteRock by GloriFi as a conservative counterbalance to BlackRock, with a focus limited to investment returns, not social positioning.  Just like Blackrock, GloriFi's ETF was going to offer market returns at a low cost; but unlike BlackRock, GloriFi would vote shares as pro-America, pro-capitalism, and anti-ESG.

70.     Ramaswamy loved the concept and texted Neugebauer on November 3, 2021, saying "I need to look at my liquidity picture and think about how much I need to hold in reserve for investing in the two other 'monopoly board pieces' we also need to get off the ground."  Ramaswamy was referencing an internally produced GloriFi "Monopoly Board" image that listed GloriFi's intended product lines as the "properties" on the board:



The red "Kentucky Ave." square on a traditional Monopoly Board was replaced with "GloriFi Asset Management" on the GloriFi Board—the square encompassing the WhiteRock ETF—and one of the two squares referenced in Ramaswamy's text.

71.    On Sunday November 7, 2021 after a weekend of discussions, Neugebauer told Ramaswamy he was not going to offer him the co-CEO role, in part because Ramaswamy planned to devote significant time to his Presidential run rather than GloriFi, but would allow Ramaswamy to become GloriFi's largest outside investor (investing $1 more than anyone else), so he could go on television and talk about his role in GloriFi as part of his intended Presidential campaign.

Ramaswamy accepted the offer to become the largest investor in GloriFi, but declined the WhiteRock opportunity only to steal, along with the other Defendants, GloriFi's concept and form a competitor soon thereafter: Strive.

72.     Unbeknownst to Neugebauer, on November 8, 2021—the day after Neugebauer told Ayers and Ramaswamy that Ramaswamy would not become co-CEO of GloriFi—Breanne Harmsen, an employee of Ayers's and the former Executive Secretary to the Vice President of the United States, illegally downloaded the entirety of GloriFi's confidential and proprietary information from GloriFi's servers on behalf of the Defendants.  While GloriFi moved ahead with its plans for a WhiteRock ETF, forming its own broker-dealer on or around December 19, 2021, Ramaswamy and the Defendants began to compete with "Project Whitestone"—apparently believing that changing the name from "WhiteRock" to "Whitestone" would save them from violating the Stockholders Agreement and other subscription documents in taking the GloriFi ETF model and launching Strive, in May 2022, as described in more detail below.  Since Ramaswamy was unable to develop his own anti-woke business to discuss on the campaign trail, he incessantly discussed the merits of the ideas and business that he stole from GloriFi, launching an energy ETF (DRLL) even though, unlike Neugebauer, he had no previous experience in the energy industry. To show their support for the Defendants, the Wall Street Journal featured the new business on its front page on May 11, 2022, roughly five months after Neugebauer (under the proection of GloriFi's confidentiality agreements) shared the idea with Ramaswamy and the other Defendants.

73.     Two weeks later, on the Sunday after Thanksgiving 2021, Neugebauer made a friendly pitch for the WhiteRock CEO position to a senior Goldman Sachs executive, who loved the idea, but was happy at Goldman Sachs. She recommended Andrew Puzder, the former CEO of the parent company of Hardee's and nominee for Secretary of Labor.  Most importantly, the

executive explained that distribution would be the big obstacle because a company cannot sell securities to an individual without a license.  Neugebauer agreed and understood GloriFi would have to have its own distribution network, which meant GloriFi would have to obtain its own broker-dealer license to be able to reach out directly to potential customers.  GloriFi hired a firm to begin the process before Christmas.  Neugebauer also instructed GloriFi's President, Ayers, to reach out to Sprecher and Griffin to see if they could expedite the ETF process and develop a strategy for favorable state law treatment.

**D.      Defendants Place Findley Within GloriFi**

74.      Also in November 2021, Lonsdale reached out and said he and Thiel were sending Keri Findley, who manages a significant portion of Thiel's liquidity and was a strategic adviser to Lonsdale, to "help" out.  In addition to managing significant investments, Findley was a close personal friend of Thiel and often stayed at his home.  Neugebauer welcomed the help but had serious concerns as Findley had been forced to leave her previous employer, Third Point, after a serious investigation by the DOJ into how she marked her investment positions.  According to Kerri, Thiel and Lonsdale rescued her by taking her in after she lost a significant portion of her assets in a divorce (after transferring those assets to her then-husband to protect from them from the DOJ).  Findley repeatedly said that she represented Thiel and Lonsdale and would do anything for them.

75.      In mid-November 2021, Ayers and Moffatt came to Dallas to discuss the capital raise along with financial modeling for GloriFi's customer acquisition strategy.  Both came from a political fundraising background where some people considered a fundraising campaign successful so long as it raised more money than it spent.  In other words, a political campaign can operate by spending $990 to raise $1,000 from donors, leaving it with more money than it started with along

with more name recognition.  But while a 1% customer acquisition margin may work in political fundraising, it does not work in business; a company must spend much less to acquire its customers than those customers produce in revenue.  Ayers and Moffatt were unprepared for the realities of customer acquisition in the business world, one of the first red flag's regarding Ayers' service to GloriFi.  Ayers' solution, predictably, was to request more money from Citadel.  In a panic, he flew on his plane to Chicago to see Ken Griffin.

**E.     The Defendants Obtain Veto Rights Over Future Financing**

76.     Waiting until the last minute before the investment round would close, on November 24, 2021, the day before Thanksgiving, Citadel and Ramaswamy put the first gun to GloriFi's head and demanded a side letter giving them special veto rights over subsequent rounds of financing for GloriFi as ultimately set forth in that certain November 26, 2021 side letter (the "Side Letter"). This is a common tactic used by venture capitalists such as Citadel, Thiel, and Lonsdale to gain control over the founders of their portfolio companies by making them captive to the venture capitalist investors for all future capital needs no matter the terms.  GloriFi agreed in order to close the financing round, with the caveat that any future common equity raise of $10 million or more would automatically convert the convertible notes into common stock and negate the veto rights in the Side Letter.  After the round closed, several of the Defendants immediately came to Dallas and committed to the employees that they would help GloriFi and its team succeed, which was the only reason they were allowed to invest.

77.     GloriFi proceeded to close the $55 million investment round on November 26, 2021. Nobody had more to risk than Neugebauer who invested $10 million, making him the largest investor.  All investments took the form of convertible debt, with GloriFi's valuation approximating $170 million post-investment.  All investors signed various documents including a Non-Disclosure

Agreement, a Proprietary Rights Agreement, and the Stockholders' Agreement.

**F.     Terms of the Stockholders Agreement**

78.     The Parties to the Original Stockholders Agreement included Toby Neugebauer, individually, Neugebauer Family Enterprises, LLC, and "each other Person who after the date hereof acquires securities of the Company and agrees to become a party to, and bound by, this Agreement…."

79.     As of October 12, 2021 and October 15, 2021, respectively, Founders Fund, the Ayers Investment Entities, and the Lonsdale Investment Entity signed Joinder Agreements and became a party to the Original Stockholders Agreement.  Pursuant to Section 5.04(c) of the Original Stockholders Agreement, the Ayers Investment Entities and Founders Fund (but not the Lonsdale Investment Entity[6]) agreed they would not engage in any "activity in which the Stockholder contributes the Stockholder's knowledge, directly or indirectly … to an entity engaged in, or developing, the same or similar business as the Company, **including those engaged in a business with a similar customer-acquisition strategy**."  *Id.* (emphasis added).  The Defendants began violating the Stockholders Agreement soon after signing it.

80.     The Ramaswamy Investment Entity, Citadel Investment Entity, Sprecher Investment Entity, Jackson Investment Entity, Seven Talents, and Carter all executed Subscription Agreements, an example of which is attached hereto as Exhibit C, whereby they acknowledged receiving and reading the Stockholders Agreement and acknowledged that upon conversion of their

---

[6] Plaintiffs do not accuse the Lonsdale Investment Entity of breaching Section 5.04(c) of the Stockholders Agreement because Lonsdale struck it from his Investment Entity's' copy of the Stockholders Agreement before executing it.  However, Lonsdale and his Investment Entity remain liable for conspiring with other Defendants to assist them in breaching their obligations under Section 5.03(c).  Lonsdale also remains liable for breach Section 5.04(d) (non-disparagement).

Convertible Notes into GloriFi stock, they would receive shares of stock in GloriFi that were subject to the Stockholders Agreement.  All of their Convertible Notes converted to GloriFi stock in April 2022.

81.     Significantly, Section 5.04(d) of the Stockholders Agreement prohibits parties from disparaging the "Company Group or its businesses, or any of its employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties."  Additionally, pursuant to § 5.04(e) of the Amended and Restated Stockholders' Agreement, all investors agreed:

> not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other Stockholders or stockholders of an Affiliate of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company Group

The Stockholders Agreement broadly defines "Confidential Information" to include "confidential, secret, and proprietary documents, materials, data, and other information, in tangible and intangible form, of and relating to the Company and its Affiliates, businesses and existing and prospective customers, suppliers, investors, and other associated third parties."

82.     The Defendants began violating the Stockholders Agreement soon after signing it (or otherwise becoming bound by it).  These violations began less than one week after Sprecher, Ayers, Findley, Carter, and individuals from Seven Talents assured the GloriFi employees that they would do everything they could to help GloriFi succeed.  To reiterate, despite his access to other capital sources, Neugebauer permitted the Defendants to invest because of their expertise and promise to help the Company succeed.

**G.     GloriFi's Customer Acquisition Strategy**

83.     GloriFi employee-shareholders continued developing its brand, technology,

regulatory licensing and platform throughout late 2021, releasing a "Brand Standards" presentation on November 28, 2021, that was given to the Defendants in Dallas and highlighted GloriFi's customer-acquisition strategy focused on anti-Woke messaging and the theme of "We the People":



84.    GloriFi developed a credit card with its name in the upper right corner and the introductory words to the United States Constitution across the face of the card. A year after developing the card, GloriFi filed a trademark application for a credit card with a "rectangular card

shape featuring the stylized words WE THE PEOPLE and part of the introductory words and part

of Article I to the US Constitution in stylized font. In the upper right corner of the foregoing design

is a stylized flag image under which the word GLORIFI appears in capital stylized letters."[7]



85.     All of the members of the RICO Enterprise were and are well aware of GloriFi's

credit card design as these cards were in the confidential investor presentations.  In fact, in a most

serious and memorable conversation about how many cards to order, Blanchard, a close friend of

the owners of the Defendant entities and a trailblazer in the credit card industry and the founder of

the nation's second-largest credit card processing firm, Total System Services (TSYS), told

Neugebauer that he believed GloriFi's launch of its credit card would be bigger than the 1990

launch of the AT&T Universal Card, which was the most successful credit card launch of all time.

During their phone conversation from his car, Blanchard encouraged Neugebauer to order millions

of cards, an unheard-of amount for a startup.

---

[7]https://tsdr.uspto.gov/documentviewer?caseId=sn97398935&docId=FTK20220510103914&linkId=11#docIndex=10&page=1.



86.     With GloriFi turning down Ramaswamy, which would have given the Defendants a co-CEO and the GloriFi presidency with Ayers, the Defendants escalated their attempts to take control of the Company, even though they owned less than 20% of GloriFi.  Using a common political tactic, Ayers and Findley, on behalf of the RICO Enterprise, sought to gain control through the hiring process by mirroring the old political "spoils" system: just as you owe a favor to the person who appoints you to a political position, an employee may feel a debt to the person who hired them.

87.     As such, Ayers, while acting as President, and Findley, as a Board member, hired Britt Amos, Ayers's neighbor and very close friend, as GloriFi's Chief Human Resources Officer. Through this hire, Ayers and Findley sought to control the hiring of key executives.  While the majority of GloriFi's staff lived and worked in Dallas, Texas, Ayers and Amos lived and worked in Atlanta, Georgia, making only a handful of trips to Dallas throughout their time with the Company.

H.    **Despite a $1+ Billion valuation, the Defendants Attempt to Replace Neugebauer (Takeover Attempt #1)**

88.    Despite the incredible success of GloriFi and its $1+ Billion valuation after less than ten months of operations, the Defendants (less than two weeks after investing) continued trying to push Neugebauer out of the way to take control of GloriFi and increase their wealth at the expense of the Company's employee-shareholders.   For instance, on or around December 8, 2021, as a means of getting more control over GloriFi, Ayers and Amos, on behalf of the Defendants and their owners, proposed replacing Neugebauer as CEO with Bryson Koehler, another Atlanta resident who previously worked with Amos at Equifax.   Of course, this transition would have only benefited the Defendants and their owners and been incredibly detrimental to GloriFi as most of its 100+ employees and contractors lived and worked in Dallas, not Atlanta.   GloriFi rejected the Defendants' blatant control grab.

89.    After only working for for GloriFi for two weeks (most of that remote from Atlanta), Amos targeted Neugebauer's leadership in an email where she argued, "we don't know what we are doing."

90.    In actuality, Neugebauer approached Company operations by focusing on worst case scenarios and potential problems, seeking constructive feedback every morning with a team call at 7:30 a.m.   Amos's email was a hit piece and the only negative feedback GloriFi ever received from the Defendants about Neugebauer or GloriFi's operations.   In retrospect, on information and belief, Amos was merely executing an order to help the Defendants and their owners take over GloriFi because Amos knew little to nothing about the Company's operations given her two-week tenure with the Company.

91.    In contrast, in the preceding ten months, Neugebauer had grown GloriFi's regulatory

compliance and licensing, customer interface, technology approach and back-office accounting with its one hundred thirty staff members, oversubscribed outside investment of $45 million, and a valuation, at that time, of more than a billion dollars.

92.     Neugebauer quickly rebuffed Amos's propaganda in a 27-point memo and, realizing she was caught, she conceded the accuracy of his analysis in writing.

93.     In fact, very few startups had come close to what GloriFi was accomplishing and, indeed, the billion-dollar outside valuation discussions validated both the concept underlying GloriFi and the work performed by GloriFi's executive team over the preceding ten months and the tremendous value of GLoriFi's proprietary and confidential information.

94.     While working on controlling GloriFi's hiring, Ayers proposed a Board consisting of himself, Findley, Jeff Sprecher and Rick Jackson--all members of the RICO Enterprise-- even though collectively they owned less than 20% of the Company.  Neugebauer rejected creating a Board with the Defendants and their agents in a 4-1 majority, but agreed to a temporary Board consisting of Ayers, Findley, and Neugebauer.  While Findley owed fiduciary duties to the Company and all of its shareholders as a member of GloriFi's Board, she made it clear in almost every employee and board meeting that, despite her fiduciary obligations, she intended to represent Thiel and Lonsdale and only cared about their interests.[8]

**I.      GloriFi Begins SPAC Conversations**

95.     On or around December 2, 2021, less than two weeks after the Billionaires and Billionaire Agents invested, GloriFi began discussions with special purpose acquisition companies (each, a "SPAC"), as a means of becoming a publicly traded company.  The investment banks,

---

[8] Plaintiffs do not bring any claim for breach of fiduciary duty, as such claim must be pursued by GloriFi's Bankruptcy Estate.

Bank of America and Cantor Fitzgerald, told Neugebauer that they believed GloriFi had a value of between $1.25 billion and $1.75 billion.

96.    The bankers were impressed with the demonstration of GloriFi's customer interface and, just as important, the back office regulatory/compliance capabilities.  In addition, the bankers absolutely believed the target customer group was in play, but just as importantly, that GloriFi had the team and strategy to execute something as complicated as the GloriFi platform and associated back office/compliance.

97.    On a phone conference, Neugebauer discussed investment banker options with members of the RICO Enterprise while he was in Charleston, South Carolina on December 23, 2021.  While everyone agreed GloriFi needed an investment bank for the SPAC, the Defendants did not want to pay banker fees to raise money for GloriFi's pre-SPAC operations because they could provide capital for the company.  Sprecher pressed GloriFi to use Moelis & Company ("Moelis") as the banker on the SPAC, which made sense as its lead banker, Augusto Sasso, lived roughly one hundred yards away from Neugebauer in Dallas.

98.    In late December 2021, Neugebauer realized that Ayers was out of his depth and more focused on corporate intrigue and his positioning within the Company and its ownership stack than actually operating and growing a business.  As a result, over the December 2021 holidays, Neugebauer decisively began to expand GloriFi's team to compensate for Ayers, but due to Ayers's texts of encouragement, Nuegebauer unfortunately still believed Ayers's word regarding the success of his fundraising efforts and investor commitment.

99.    Indeed, Ayers, when engaged with the GloriFi team, focused entirely on public perception of his role within GloriFi and his personal agenda, with no regard for actual job responsibilities or growing GloriFi's core business.  With the addition of the new leadership team

and vetting of potential SPAC partners, Ayers's obsession with public perception became even more pronounced.  When interacting with the operations team, Ayers sole focus surrounded the appearance of his name in Company presentations and a constant reminder to them that he was President.

100.    In early 2022, GloriFi, through Moelis, identified DHC Acquisition Corp. ("DHC"), whose initials stand for duty, honor, and country, as its most likely SPAC for a merger.  Ayers and Findley downplayed DHC because of their lack of personal influence within that organization.  In fact, Ayers took affirmative steps to blow up any deal with DHC, undermining the initial January call between GloriFi and DHC.  Ayers's commentary was so inappropriate that Augusto Sasso, the lead banker from Moelis, felt the need to have an immediate follow up call with Ayers to reprimand him.

101.    Because they had limited influence with DHC, Ayers and Findley pushed GloriFi to work with a SPAC run by Omeed Malik, a friend of Findley who had close economic ties to Thiel and Findley.  However, Findley and Ayers failed to disclose Malik's strong economic ties to Thiel and the fact that Findley and Thiel were two of the largest investors in Malik's fund, creating a conflict of interest with respect to Findley's role in vetting potential SPAC partners while she sat on GloriFi's Board. Neugebauer insisted on DHC as it was a perfect cultural match for GloriFi.





102.     Ayers, driven by his own greed and ego along with public perception, also became

frustrated that he would not be publicly disclosed as a founder of GloriFi in the S-4 filing with the

SEC because he owned less than 5% of GloriFi stock.  As a result, he argued that the signing of the

term sheet for the DHC SPAC transaction triggered a performance incentive that would increase

37

his ownership interest, and inappropriately lobbied the Company's investment bank, Moelis for the ownership increase.  However, that incentive required GloriFi to close a round of financing at a valuation over $1.5 billion, not merely sign a term sheet—as required by all members of the RICO Enterprise in their own companies' investment incentives are earned on actual closings.  Even so, Findley argued that GloriFi should give Ayers the additional equity at the expense of other stockholders for a transaction that had not yet occurred.[9]  GloriFi did not acquiesce to the ridiculous demands of Ayers and Findley.

103.    Additionally, in her capacity as Thiel's agent, Findley pushed for Thiel to supply $75 million to capitalize the credit card business and another $75 million for a required insurance surplus note.  Control over the funding required for the insurance and credit card programs would give the Defendants control over the Company's ability to launch two of its key products.  In trying to box out other potential surplus note investors for Thiel's benefit, Findley would do outrageous things like falsely claim Donald Trump Jr. was about to become GloriFi's CEO.  While GloriFi maintained a good relationship with the Trump family, everyone knew that in 2022 the Trump name was toxic with Wall Street – the traditional funders of insurance and credit card debt.  Furthermore, GloriFi had no plans to hire Trump Jr.  Rather, Findley's references to Trump Jr. served their intended purpose of keeping mainstream debt providers from competing with Thiel to fund the insurance and credit card surplus.  Thiel never provided the capital promised by Findley.  The Neugebauer family later provided the money for the credit cards after Defendants destroyed all other financing options (as described below).

---

[9] Plaintiffs do not bring any claim for breach of fiduciary duty as such claim must be pursued by GloriFi's Bankruptcy Estate.

**J.    The Defamation/Disparagement Led Coup**

104.    On January 21, 2022, Neugebauer made a presentation to investors (called "Running the Rapids"), showing them that GloriFi was generally on budget financially, but would need to raise an additional $40 million as part of SEC requirements for the SPAC transaction under a rule that required enough capital in the company to sustain its operations until the merger closed.  Many of the Defendants did not want GloriFi to go through the expense of hiring an investment banker to assist in the capital raise because, in their words, "they had this."  Neugebauer believed them.

105.    On January 6, 2022, less than sixty days after the Defendants invested, on a hunting trip at Paul Tudor Jones' ranch, the two groups within the RICO Enterprise, Ayers (representing Citadel, Ramaswamy, Sprecher, and Jackson) and Lonsdale (representing Thiel and Founders Fund) finalized their already ongoing plan to take control of GloriFi from Neugebauer.  Two weeks later, in an Atlanta meeting on or around January 26, 2022, Ayers explained to Cathy Landtroop, a GloriFi senior executive, that they would be taking over GloriFi from Neugebauer based on the backing of his billionaire friends, including Citadel, Lonsdale, Thiel, and Jackson.  Landtroop, knowing that Neugebauer owned 65% of GloriFi did not give it much thought.

106.    Around the same time, Gaertner, co-CEO of DHC, flew to Aspen to meet with Neugebauer concerning his future plans at GloriFi and how to manage Ayers.  Gaertner, a Silicon Valley investment banking veteran, has been a lead advisor for capital markets, mergers and acquisitions on some of the largest deals in technology, and has led dozens of IPOs for the most successful companies including Google and OpenTable.  He told Neugebauer it would be a mistake to make Ayers the face of GloriFi and that Neugebauer needed to stay in the CEO role for the foreseeable future.

107.    Despite the Defendants' interference, GloriFi signed a term sheet with DHC on

January 27, 2022, placing the post-SPAC value of GloriFi at $1.65 billion.  So long as GloriFi was able to raise $40 million to cover operations until the SPAC transaction closed, DHC would provide GloriFi with $300 million in funding upon closing.

**K.      Defendants' Manufactured Liquidity Crisis #1**

108.    On February 25, 2022, less than ninety days after the Defendants invested, Ayers flew to Little Rock, Arkansas to meet with Gaertner and another potential investor, Ronnie Cameron (the "Little Rock Meeting").  While at the Little Rock Meeting, Ayers revealed the RICO Enterprise's plan to take control of GloriFi and remove Neugebauer.

109.    After defaming and disparaging Neugebauer, Ayers explained that Griffin, Thiel, Sprecher, and Jackson were not going to provide the capital to consummate the SPAC transaction without taking control of GloriFi and replacing Neugebauer with Ramaswamy, despite the fact that those investors had praised  GloriFi's progress under Neugebauer's leadership to Neugebauer's face. Subsequently the Defendants gave Gaertner and DHC a term sheet that would take control of GloriFi away from Neugebauer (its majority owner) in exchange for an additional investment by Thiel, Citadel/Griffin, and Sprecher's other billionaire contacts (the "Conspirators Term Sheet").

110.    This conduct interfered with GloriFi's transaction with DHC through defamation and disparagement, lies, and deceit.  The Defendants did not want Neugebauer to know that they were behind a term sheet attempting to take control of the Company, so Ayers and the rest of the Defendants directed DHC to avoid mentioning who would provide the funding to GloriFi within the Conspirators Term Sheet itself.  Gaertner and DHC would not have engaged without the full support and involvement of Citadel, Sprecher and Thiel.  Neither Ayers, nor DHC, notified Neugebauer or anyone else at GloriFi that the Defendants were preparing their own Conspirators Term Sheet.

111.   Perhaps recognizing that he had violated his contractual obligations[10] in connection with the Little Rock Meeting and Conspirators Term Sheet, on March 2, 2022, Ayers began to falsely claim he was not, in fact, GloriFi's President, but merely a Board Member.  Calling Ayers out in text messages, GloriFi co-founder Bryan Joiner pointed out that all GloriFi documents, including those drafted by Ayers, identified him as the Company president and that he received 3% equity for his service as President.   Again, Neugebauer had no reason to suspect the nefarious actions as Ayers would hide his deceit with Bible verses and encouraging words.   Below are two sets of texts, one from Ayers to Neugebauer and his wife and the other from Ayers to Neugebauer, his wife, and Ayers's wife, both before and after the Little Rock Meeting.



Nothing in any of the texts suggests that Ayers's was dissatisfied with Neugebauer's leadership or attempting to depose him.

112.   Consistent with the Defendants' plan to seize control of GloriFi, they represented,

---

[10] Plaintiffs do not bring any claim for breach of fiduciary duty as such claim must be pursued by GloriFi's Bankruptcy Estate.

41

through Ayers and Findley, that they intended to fund GloriFi with the $40 million in liquidity necessary prior to the SPAC transaction, as well as money for the credit card and insurance business.

113.    In fact, from January through March, Ayers (as agent for Citadel, Sprecher, Jackson, and Ramaswamy) and Findley (as agent for Thiel, Lonsdale, and Founders Fund) participated in daily calls with the GloriFi executive team.  Neugebauer always gave Ayers the opportunity to speak first on each call and he constantly reiterated that things were going great with the Billionaire Defendants and they would provide the liquidity necessary to bridge the company to the SPAC transaction.  Significantly, Ayers and Findley intentionally omitted that such funding was contingent on seizing control of GloriFi from Neugebauer.

114.    In the beginning of March 2022, and repeating conversations shared with everyone in January, Neugebauer and Joiner reminded Ayers that the Company was projected to run out of money and, on Wednesday, March 23, 2022, Neugebauer pressed Ayers to close the $40 million financing round.  Ayers shocked Neugebauer (and the other GloriFi executives), by stating that he could only be sure of obtaining an additional $5 million, far short of the $40+ million he had previously led the Company to believe.  Given sufficient time and his track record, Neugebauer could have easily raised the necessary funds, but Ayers blindsided him with the last-minute announcement.

115.    Shocked by Ayers's news, Neugebauer and Joiner flew to San Francisco on March 24, 2022, to meet with Findley.  At the San Francisco airport FBO, Findley told them that Ayers and the investors were "playing a game of chicken with you."  She said Ayers could obtain the $40 million investment, but Neugebauer would have to give up many of his rights as the Company's majority shareholder and allow the Defendants to take over.  Findley said that as long as

Neugebauer made Ayers happy, Citadel would invest another $50 million. Findley said Neugebauer should "give [Ayers] what he wants" and then disingenuously suggested she would "tear it up" later and restore Neugebauer's rights. While suggesting the same basic outline contained within the Conspirators Term Sheet itself, Findley did not disclose to Neugebauer her knowledge of its existence much less her involvement in crafting it.

116.    Forty-eight hours later and only one hundred twenty days after initial closing, as a continuing part of the game of chicken, on March 26, 2022 Ayers and Findley demanded Neugebauer's resignation as CEO of GloriFi, claiming he could not "raise enough money," even though Ayers and Findley served on the Board and had volunteered to source the money from their billionaire benefactors. Neugebauer left the meeting. At no time prior to this conversation, except for Amos's uninformed comments during her first two weeks of employment, did Neugebauer receive any concerns about how the Company was being run.

117.    Earlier that same morning, Griffin reached out to Neugebauer concerning an investment in the Chelsea soccer team with Joe Ricketts, a Coign investor, without any mention of problems with GloriFi or a demand for Neugebauer to resign. Confused, Neugebauer did not respond to Griffin to ask about Citadel's investment in GloriFi, but reached out to Carter, Citadel's point-person in GloriFi, because Carter had a reputation of being ultra-sensitive when people went straight to Griffin rather than through him.

118.    Demonstrating how the Defendants were all working together, Carter said Citadel was not planning to invest any additional funds until Lonsdale completed his due diligence. However, Lonsdale had not communicated the need for any due diligence to GloriFi. In fact, Carter's proposed timeline was wholly inconsistent with the needs of the Company as presented by Neugebauer in his January "Running the Rapids" presentation and Ayers' representations to

Neugebauer and other GloriFi executives between January and March regarding Citadel's investment plans.

**L.    Proposed Capital Raise at a $750 Million Valuation: A 55% Discount Off of the $1.65 Billion SPAC**

119.    On Sunday March 27, 2022, recognizing GloriFi's impending liquidity crisis, Neugebauer worked with Moelis to propose new terms to attract capital: a $40 million round of super senior convertible debt financing at a $750 million valuation (a 55% discount off of the anticipated $1.65 billion SPAC, highlighting the damage already caused by the Defendants), with the Neugebauer family leading the round with a $10 million investment.

120.    Neugebauer, Moelis, Bank of America and DHC had a call with employees, shareholders and investors on March 27, 2022 to propose the new terms.  Having just received the results of extensive due diligence of GloriFi by the Big Four accounting firm KPMG, DHC reaffirmed its commitment to the prospects of the company and to the SPAC and Moelis expressed confidence that a public offering could be achieved at the valuations outlined in the DHC LOI. Following the meeting, Ayers called Sasso of Moelis and, after asking if the DHC deal "was real," promised to get the money necessary to close the round.  Ayers did not disclose that he intended to get it by completing a hostile takeover of GloriFi through the Conspirators Term Sheet.

121.    The following day, March 28, 2022, GloriFi had a Board call to discuss the $750 million round. Recognizing GloriFi's liquidity crises, Ayers, Findley, and Ramaswamy utilized another common political axiom – never let a crisis go to waste.  Accordingly, Ayers and Findley, with Ramaswamy supporting them with his Side Letter veto threat, voted against raising money using a $750 million valuation because they already planned to gain control of GloriFi through the Conspirators Term Sheet.

44

122.    Neugebauer then flew to Ohio to give a detailed update of the Company to Ramaswamy who indicated that Neugebauer was a "compelling CEO", and he had no concerns with how the Company was being run.  Ramaswamy made clear he was working with the Citadel's Cason Carter on GloriFi funding.   Unbeknownst to Neugebauer, Ramaswamy made these comments to keep Neugebauer in the dark and despite the fact that Ramaswamy was actually helping lead the takeover on behalf of the Defendants and had been promised the CEO position.

123.    Instead of allowing the Company to move forward, Ayers, Findley, and Ramaswamy advocated for raising money for GloriFi under the same terms as the November investment round, something they knew Neugebauer as a fiduciary for his fellow employee-owners could not accept in light of the DHC deal.

124.    On the same Board call, Ayers, Findley, and Ramaswamy (who had observation rights) accused Neugebauer of withholding a term sheet from DHC, without disclosing that they were the ones behind it and knew its terms.  In fact, the Defendants had failed to coordinate delivery of the Conspirators Term Sheet with DHC.  As a result, while each of them knew of the existence and terms of the Conspirators Term Sheet, Neugebauer had no knowledge whatsoever.  Instead, Neugebauer believed they were referencing an expected extension of the LOI for the DHC SPAC. The significance of the Conspirators Term Sheet as referenced by Ayers, Findley, and Ramaswamy did not become clear to Neugebauer until the next day.

125.    To highlight Ayers's and Findley's vote against financing, Neugebauer agreed to take both options to the Company's shareholders, most of whom were employees, for a vote. GloriFi scheduled a Shareholder meeting on or around March 29, 2022.  In a sharp rebuke to the Defendants, over 90% of the GloriFi employee-stockholders approved raising capital at a $750 million valuation – the terms proposed by Neugebauer and Moelis on the Sunday evening call.

126.    After the vote, in what could only be legal positioning, Ramaswamy said he would support the raise at the higher $750 million valuation if at least 50% of the convertible note holders agreed.  Ramaswamy's support was necessary due to his and Citadel's veto rights contained in the Side Letter.  However, Ramaswamy understood that the other members of the RICO Enterprise would not approve the $750 million capital raise.  Rather, his agreement was merely meant to buy time to present Neugebauer with the Conspirators Term Sheet and force him to cede control of GloriFi.

127.    Panicked, knowing of her clear breaches of her and the Founders' Fund's obligations and knowing that DHC would be delivering the Conspirators Term Sheet in hours, Findley told Neugebauer that "we" (meaning herself, Thiel, Lonsdale, and Founders Fund) needed legal releases in texts to both Neugebauer and Joiner.  She wanted the proverbial "get out of jail free" card for her and Thiel's egregious actions.  Throughout her time at GloriFi—and thereafter—Findley used "we" to refer to herself, Thiel, Lonsdale, and Founders Fund because she was serving as their agent on GloriFi's Board.  Indeed, as late as the week of April 10, 2024, Findley used the term "we" in Austin, Texas to describe herself, Thiel, Lonsdale, and the rest of the Defendants when repeating her defamatory allegations that Neugebauer stole GloriFi's tech stack.

**M.    Defendants' Catch-22 Fiduciary Duty Trap #1: The Conspirators Term Sheet**

128.    Meanwhile, on the evening of March 29, 2022, Gaertner of DHC presented Neugebauer with the Conspirators Term Sheet whereby DHC proposed to "seek to raise" the $40 million for GloriFi.  The Conspirators Term Sheet was problematic for multiple reasons.  First, as DHC could not participate on both sides of the SPAC transaction, there was no way it could provide any of the $40 million GloriFi needed.  Second, the Conspirators Term Sheet did not actually require anyone to provide the $40 million, just that DHC would "seek to raise" it.  Third, the

Defendants utilized DHC as a proxy to demand that Neugebauer give up many of his contractual voting rights and resign as CEO before DHC would move forward.  <u>Fourth</u>, all of the insurance and banking license applications were in Neugebauer's name, which could not be changed without restarting the process.  By working through DHC, the Defendants attempted to distance themselves from the attacks on Neugebauer but still be able to reap the rewards by putting up the $40 million after Neugebauer signed the Conspirators Term Sheet and gave up control.

129.    The Defendants knew that the Conspirators Term Sheet placed Neugebauer in his first Catch-22 fiduciary duty trap.  On the one hand, as the majority owner of GloriFi, Neugebauer had every incentive to maintain his contractual voting rights.  On the other hand, as CEO of GloriFi, he had a duty to the Company and other shareholders to raise money to sustain operations.

130.    On the morning of March 31, 2022, Neugebauer and the finance team spoke with Rick Jackson, who indicated he was supportive of a capital raise at the $750 million valuation as approved by the GloriFi shareholders.  Jackson's purported support meant that more than 50% of the convertible debt holders agreed to the raise, which should have triggered Ramaswamy's support.  However, Jackson was not sincere in his position once he realized that his support meant approval of the financing.  There was no way the Defendants were going to allow GloriFi to raise money from anyone other than themselves.

131.    Later, on March 31, 2022, Tom Morgan, DHC's other co-CEO met Neugebauer at the Dallas FBO to negotiate the Conspirators Term Sheet.  Morgan told Neugebauer that the Defendants ("investors from Chicago") would fund the $40 million as long as he and Neugebauer reached an agreement and executed the Conspirators Term Sheet.  Recognizing that the Defendants had trapped him, Neugebauer negotiated with Morgan to give up his super majority rights and jointly appoint a new Board of Directors, while remaining CEO, in exchange for the $40 million

investment.  Morgan and Neugebauer waited awkwardly at the airport for two hours before Morgan received confirmation that he could sign the Conspirators Term Sheet as negotiated.  Under duress, Neugebauer signed the Conspirators Term Sheet and Morgan countersigned.  Then Neugebauer emailed the signed Conspirators Term Sheet to all of GloriFi's employees.

132.    Meanwhile, to show their pride in the direction of the company, and without Neugebauer's knowledge, the other GloriFi executives conducted their own Zoom meeting with the Defendants while Neugebauer was in flight, demonstrating GloriFi's progress and endorsing Neugebauer as CEO.

133.    Although Neugebauer had never received anything but praise for his work as CEO from the Defendants prior to March of 2022, once the Defendants learned that Neugebauer would remain CEO and have joint Board appointment rights, they rescinded their offer to fund the $40 million and demanded that DHC terminate the Conspirators Term Sheet.  Gaertner disclosed and apologized to Neugebauer for their involvement in the creation of the Conspirators Term Sheet and explained what happened with the Little Rock Meeting and indicated they had succumbed to the pressure of this powerful group.

134.    In other words, even though GloriFi had a merger offer to bring in $300 million into the Company at a $1.65 billion valuation, GloriFi's entire staff of employees supported Neugebauer as GloriFi CEO, and the Defendants had previously expressed support and admiration for Neugebauer's work, the Defendants were now forcing the Company's bankruptcy to remove him. Specifically, with Citadel having the veto rights, the Defendants could essentially force GloriFi into bankruptcy by preventing financing, then provide debtor in possession financing to gain control over the bankruptcy process and then either keep GloriFi or use its intellectual property for the companies they were creating.

**N.      A $10 Million Equity Raise Eliminates the Side Letter Rights**

135.    With the Board (Ayers and Findley) rejecting the super senior raise at a $750 million valuation and the Defendants with Ramaswamy and Citadel utilizing their veto and refusing to fund under the Conspirators Term Sheet, GloriFi was forced to seek bankruptcy counsel on April 1, 2022, and retained Weil Gotshal & Manges LLP to assist.  The Defendants had won.

136.    On Saturday, April 2, 2022 Neugebauer remembered that the Side Letter contained a provision automatically converting all convertible notes to common stock upon the closing of any common stock offering in excess of $10 million—and eliminating the Defendants' veto power over future capital raises.  Accordingly, Neugebauer proposed a $10 million common equity offering at a valuation of $250 million, higher than the valuation proposed by the Defendants, with each current investor receiving the right to participate on a *pro rata* basis based on their current investment in GloriFi.

137.    Panicked by the realization that the Side Letter allowed Neugebauer to invest without the Defendants' consent, Findley and Ayers voted against the $10 million equity—even though their vote would have forced the Company to declare bankruptcy.

138.    Then, Neugebauer exercised his right to expand GloriFi's Board by adding two new Board members: Charlie Hamilton and John Norwood.  Findley was subsequently removed from the GloriFi Board for cause.[11]

139.    On April 4, 2022, GloriFi held a Board meeting with Neugebauer, Ayers, Norwood, and Hamilton in attendance.  Neugebauer, Hamilton, and Norwood all voted to move forward with the $10 million capital raise at a $250 million valuation, with all investors (including the

---

[11] Plaintiffs do not bring any claim for breach of fiduciary duty as such claim must be pursued by GloriFi's Bankruptcy Estate.

Defendants) able to participate *pro rata*.  The Board vote presented a clear choice between the interests of the powerful Defendants and the interests of GloriFi itself.  In a statement only a politician could make, Ayers said he was against the capital raise unless he had to be for it.  More specifically, he said he was against it because it converted the Defendants' debt into equity and eliminated the Side Letter veto rights, but he was also for it if his fiduciary obligations to GloriFi required him to support it.[12]

140.    Unable to continue working with a Board member so conflicted about his fiduciary obligations to GloriFi, as Ayers was working solely for his billionaire benefactors, Neugebauer initiated a vote of shareholders (again, most of whom were GloriFi employees) to remove Ayers from the GloriFi Board.  93% of shares controlled by persons other than Neugebauer[13]—the GloriFi employees—voted to remove Ayers and he was removed from the Board effective April 4, 2022. This was a courageous vote by the GloriFi employees standing up to the Billionaires as they all knew Ayers spoke on their behalf as their representative within GloriFi.  The remainder of the Board affirmed its support for the $10 million raise at a $250 million valuation.

141.    GloriFi made a presentation to investors regarding the terms of the common stock capital raise on April 11, 2022, and closed the round on April 15, 2022, with Neugebauer investing approximately $9 million and others investing approximately $1 million.  All members of the RICO Enterprise declined their option to participate in the capital raise.  All pre-existing convertible debt also converted to common stock on the same day.  GloriFi had survived another liquidity crisis.

**O.    Liquidity Crisis #3 and Catch-22 Fiduciary Duty Trap #2**

---

[12] Plaintiffs do not bring any claim for breach of fiduciary duty as such claim must be pursued by GloriFi's Bankruptcy Estate.

[13] Under the corporate documents, Neugebauer was precluded from voting.

142.    With the closing of the $10 million round, all convertible debt became common stock and all previous debt holders became subject to the Stockholders Agreement.

143.    With the Company's leadership all on the same page, the Board voted to proceed with an additional $40 million super senior capital raise at a discounted valuation of $500 million (a 70% discount off of the SPAC valuation), showing the magnitude of damage the Defendants caused to GloriFi within a one-month time period.  Moelis, DHC, Bank of America, and GloriFi enthusiastically agreed to move forward with the SPAC and just needed to receive GloriFi's 2021 audit, which was expected to be completed any day.

144.    Unhappy that they could not get rid of Neugebauer and upset about their expulsion from GloriFi, the Defendants escalated their character assassination attacks to prevent GloriFi from completing its audit, raising capital, or closing the DHC deal.  Specifically, Ayers, Findley and Citadel on behalf of the RICO Enterprise violated Section 5.04(d) of the Stockholders Agreement, which prohibited them from disparaging the "Company Group or its businesses, or any of its employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties" with knowingly false and baseless lies.

145.    Ironically, while the Defendants were strip-mining GloriFi's intellectual property and creating their new competing entities, Findley, having formerly served as head of GloriFi's audit committee, accused Neugebauer of stealing technology from the company and persisted in her complaint even after GloriFi's Chief Technology Officer told her it was not true.  Findley, as a tactic for the Defendants, argued that Neugebauer's banking entity wrongfully acquired GloriFi assets.  In fact, the investigation later determined that GloriFi <u>owed Neugebauer and the banking entity</u> at least $3.5 million.

51

146.    The   Defendants   even   accused Neugebauer of threatening Ramaswamy with a gun, which they knew was false.[14]   In fact, they knew Neugebauer did not even carry a gun, going so far as to arrange for him to receive a "GloriFi" gun for Christmas, which he has not used to this day:



147.    Findley, on behalf of the RICO Enterprise, also called GloriFi's outside counsel, Mike Blankenship of Winston & Strawn, and asked him to call the FBI to report Neugebauer for theft of GloriFi's tech stack.   Porter, Ayers and Findley made other claims, such as alleging that Neugebauer created a hostile work environment, even though 93% of the employee shareholders had just voted against them in favor of Neugebauer's leadership and there were no complaints against Neugebauer at this time.

148.    Led by Citadel, the Defendants hired Citadel's outside law firm Kirkland & Ellis ("Kirkland"), which was also headquartered in Chicago, to prosecute their charges.   Kirkland called GloriFi's outside counsel (Winston & Strawn), its auditor (Crow), and members of GloriFi's board with accusations about Neugebauer while refusing to disclose the name(s) of their client(s).   If the Defendants had been acting in the best interest of GloriFi, they would have no compunctions about their lawyer explaining who he was representing, but the Defendants apparently instructed Porter to hide their role because their instructions to him violated the non-disparagement provisions of the Stockholders Agreement.

_____

[14] Indeed, the Defendants continued their false allegations concerning Neugebauer and threats with guns to the law firms investigating GloriFi and in a September 2023 Wall Street Journal article, falsely stating that Neugebauer had threatened to fly to Ohio and kill Ramaswamy with a gun.

149.    The GloriFi Board and Neugebauer were forced to take the Defendants' false and baseless allegations very seriously.  Neugebauer appointed an independent crisis board member, Alan Carr, to lead the investigation.  On April 28, 2022, the GloriFi Board retained the nationally recognized law firm Locke Lord to conduct an investigation.  At the same time, Moelis hired Sullivan & Cromwell, and DHC hired Cooley, to work on the merger transaction and, as a result, the investigation.  As set forth above, the Defendants utilized Kirkland.  Winston & Strawn continued to represent GloriFi.  Neugebauer was not represented by counsel.  Five of the largest and most reputable law firms in this country thoroughly investigated every allegation into Neugebauer, including reviewing tens of thousands of emails and interviewing 22 key employees.

150.    The Defendants, as experts in the capital markets who had collectively taken hundreds of companies public, knew the investigation itself, regardless of its findings, would likely mean the death penalty for GloriFi's public offering and Neugebauer's career.  Caring only for themselves, they pushed their allegations while working to establish or invest in GloriFi competitors.  Yet Ayers and Findley would not even meet with investigators about their own complaints to explain their allegations without compensation.

151.    The Defendants' improper actions put Neugebauer in a second Catch-22 fiduciary duty trap and created GloriFi's third liquidity crisis.  On the one hand, no one would be willing to invest in GloriFi if Neugebauer told them he was under investigation by his own Company, no matter how frivolous the allegations.  On the other hand, if he failed to disclose the investigation, he risked committing securities fraud.  Neugebauer disclosed the investigation and fundraising came to a halt.  Then, to draw out the investigation, every time an allegation was disproven, Kirkland would present a new (false) allegation for additional investigation.  Towards the end of the investigation, employees reported to the Board that they felt pressure to falsely disparage

Neugebauer.  Meanwhile, DHC regularly visited Neugebauer's house, staying for hours and hours, observing GloriFi's progress and the *esprit de corps* of GloriFi's working environment in person.

152.    During the investigation, the Defendants announced their competing companies proving the malicious intent behind their efforts.  After preventing GloriFi from raising any money to grow its business due to their allegations, the Defendants proceeded to violate Section 5.04 of the Stockholders Agreement by launching and expanding ventures utilizing GloriFi's Confidential Information including, but not limited to, the same customer acquisition strategy as GloriFi (Old Glory, Strive, and Coign) as set forth below.  By the beginning of August 2022, the Defendants had moved on to those competing businesses and needed GloriFi to fail.  They were no longer attempting to take over GloriFi, they were just trying to kill it.

153.    On June 24, 2022, following their thorough investigation, Locke Lord cleared Neugebauer of all allegations.  Then, on June 30, 2022, Crowe completed its audit.  After completion of the investigation and release of the audit, DHC reaffirmed the SPAC transaction at a value of $1.65 billion.[15]  DHC, Moelis, Cooley, and Sullivan all signed off on the SPAC transaction.

154.    The GloriFi Board also voted to bring a civil action under the arbitration agreements in the Company's documents against Ayers, Rios, Fadden and Curry seeking $100 million, while still hoping to reconcile with Ayers's billionaire bosses.

155.    The Company filed its S-4, announcing the SPAC transaction on July 25, 2022 and was poised to complete its fundraising.  It had survived Liquidity Crisis #3 but was severely wounded.

---

[15] https://www.winston.com/en/experience/GloriFi-announces-business-combination-with-dhc-acquisition-corp-68243300.

**P.      Liquidity Crisis #4 and Catch-22 Fiduciary Trap #3.**

156.    After the filing of the S-4 with the SEC, there was a sense of optimism at GloriFi despite the significant financial strain of payables that had continued to pile up despite the significant investments by the Neugebauer family and the support of their friends in Midland.

157.    Having not bankrupted GloriFi and unable to convince major law firms, accounting firms, investment banks and sophisticated investors like DHC of their lies, the Defendants approached a friendly contact at the Wall Street Journal with the claims that had just been investigated and new defamations claims based incidents they themselves manufactured as political masters of the universe, encouraging others to do the dirty work by acting unethically or illegally. The Wall Street Journal boasted that they had information coming from within the Company and the Company had serious breaches of data integrity.  GloriFi discovered the leak came from the Alabama office led by Jonathan Pennington, a RICO Enterprise agent embedded within GloriFi, who supervised the illegal downloading of GloriFi financial reports and their transmission to the Wall Street Journal on or around October 2, 2022.  Like in their dirty political campaigns, Defendants encouraged unethical and illegal behavior such as a false police report filed by GloriFi employee Manny Rios against Neugebauer,[16] false human resource complaints by Jerome Fadden against Neugebauer, and the creation and leaking of a confidential internal GloriFi memo. Defendants also leaked GloriFi emails with investors, privileged communications between GloriFi and its legal counsel, and a lawsuit filed against GloriFi by a vendor—all in violation of their

---

[16] Interestingly, only three days after Rios claimed Neugebauer assaulted him at P.F. Chang's, , Rios emailed Neugebauer on May 27, 2022, telling him to "[o]rder my bathrobe please, like it or not I am going to be tethered to you for 4 weeks."   Rios's email, stating he planned to live at Neugebauer's house for a month, was plainly inconsistent with the Defendants' allegations that Neugebauer was a threat to employees and created a hostile work environment.

obligations under the Stockholders Agreement.  In addition to the claims they used to launch the investigation, they manufactured the new defamation that would then become the story that they themselves created.  At the end of the day, the claims were circular, with the Wall Street Journal citing the false accusations they created (or pressured others to create) as the only evidence supporting their own verbal allegations.

158.    It started in late July 2022 when Anna Maria, a consumer finance reporter from the Wall Street Journal contacted the Company about doing a story on GloriFi's credit card launch, which was creating a lot of buzz, and began interviewing members of the GloriFi team.  It was going to be a very positive story for GloriFi.  But only a few days into her reporting, she informed the Company that a negative story about GloriFi was coming from the "top down" at the request of senior Wall Street Journal executives.  They denied her request to publish an article about GloriFi's intended success.  In fact, the Wall Street Journal called GloriFi on August 2, 2022 to ask for comment and subsequently called every person associated with GloriFi that it could identify (or with whom the Defendants connected it).

159.    The employees of GloriFi did not let GloriFi go down without a fight.  GloriFi's new head of Human Resources, Pamela Rehnquist, its General Counsel, Tanya Wallace, and its Chief Marketing Officer, Landtroop, all vehemently denied the allegations. DHC, Moelis and Bank of America all supported GloriFi and Neugebauer.  They encouraged the Wall Street Journal to call Locke Lord, who confirmed that had investigated the allegations and that they were false, and the GloriFi executives even flew to New York to sit down with the reporters and gave them a live demonstration.

160.    GloriFi was at a huge disadvantage because it was prohibited from publicly commenting in full due to the confidentiality requirements of the pending arbitration against Ayers.

Unlike the Defendants, GloriFi intended to honor its agreements of confidentiality regarding the Company's prosecution of claims against Ayers and others in arbitration. As a result, there was little to nothing that could be said and all the facts described in this Complaint could not be disclosed. Again, Neugebauer and GloriFi could not defend themselves while honoring their agreements.

161.    During the Wall Street Journal investigation, Neugebauer received an unsolicited call from William Burck, a Washington power broker who is Managing Partner at Quinn Emmanuel ("Quinn"), one of the country's leading litigation firms. Mr. Burck told Neugebauer that he was Rupert Murdoch's personal attorney and on the Board of Fox, the parent company of the Wall Street Journal, and said he could help with GloriFi's problems with both the Wall Street Journal, Peter Thiel, and Nick Ayers.

162.    In September 2022, Neugebauer met with Burck at his country club in Washington, D.C. to share the disparagement issues and update him on the arbitration against Ayers. Burck acted supremely confident on all matters and asked GloriFi to transfer the case file to him. GloriFi sent him a $150,000 retainer per his request and initiated the transfer of the case file. But GloriFi never received any work product from Quinn and essentially never heard from Burck again until reading three months later about Burck representing Ken Griffin in his case against the IRS. Neither Quinn nor Burck assisted GloriFi in connection with the Wall Street Journal.

163.    Once again Neugebauer was placed in a Catch-22 Fiduciary Duty Trap where he could not raise money if he disclosed the potential Wall Street Journal article, but failure to disclose the potential article put him at risk of committing securities fraud. The Defendants, now direct competitors of GloriFi, used the Wall Street Journal to prepare to inflict the final fatal wounds resulting from their defamation and disparagement campaign. Moelis and DHC made a number of

calls on GloriFi's behalf, but the Defendants' damage had already been done.

164.    Throughout the Summer of 2022, the Defendants were relentless in their defamation campaign against Neugebauer and ultimately the Company with potential investors.  It was hard enough to raise money with a WSJ investigation hanging over its head, but every time the Company got traction with investors, the Defendants were there to disparage and destroy.  The Plaintiffs know about the defamation to: Ray Washburne, a prominent Dallas businessman; Donald Trump Jr., who wanted to get involved and help raise $75 million; and Matthew Crouch, CEO of Trinity Broadcasting Network, who verbally agreed to invest $30 million—after being told about the Wall Street Journal article and the Company's severe financial strain.  Crouch shared with the employees an inspiring story about when his dad started Trinity Broadcasting Network and how an angel investor saved it.  But Crouch never closed on the funding and is now in discussions with members of the RICO Enterprise.

165.    Despite the distractions, GloriFi stayed focused on its business.  And, as a testament to its progress and potential, GloriFi proceeded to solidify its Board of Directors, effective upon the DHC SPAC closing, adding Joe Forehand, the former Chairman of First Data and former CEO of Accenture, and Andy Main, the former CEO of Ogilvy.  Fortress, one of the country's largest hedge funds began documentation on a $100+ million plus lending facility to fund the credit card receivables.  One of the most sophisticated investors in the world, Fortress did comprehensive due diligence over a ninety-day period on every aspect of GloriFi's business, from customer acquisition to the back office and every function in between.  Fortress's work provides a great testament to the fact the Company was ready for a nationwide launch.

166.    GloriFi took its credit card and App live nationwide with the country's largest ATM network on Saturday, October 8, 2022, with a major media launch headlined by conservative

commentator Candace Owens.  Within 24 hours, GloriFi had become the 11th most popular finance application in the Apple App Store.  Over 20,000 people quickly followed GloriFi on Instagram and within three days more than 140,000 people visited GloriFi's website with 33,000 signing up as members and opening 5,000 new accounts, proving the efficacy of the Company's low-cost customer acquisition strategy.  However, despite (or perhaps because of) this successful launch, the Defendants continued to disparage Neugebauer and discourage potential investors.

167.    Meanwhile, the Wall Street Journal responded to GloriFi's Saturday launch with a Monday morning publication of its long-prepared hit piece on Neugebauer and GloriFi titled "How a New Anti-Woke Bank Stumbled" based on information leaked to it by the Defendants.  Only the influence of the Defendants could have caused the Wall Street Journal to publish a story based on investigated and debunked allegations.  With timing designed to cause maximum damage and finish off GloriFi, the article repeated many of the previously debunked allegations against GloriFi and Neugebauer.  But despite their posturing in communications with the Wall Street Journal, this was not a business dispute between Neugebauer and the Defendants regarding his leadership.  Although documentation was substantially complete, the Wall Street Journal article resulted in termination of the Fortress deal for credit card lending.

168.    In an effort to preserve the Company and restart fundraising, and with false promises from the Defendants that they would provide support, Neugebauer resigned within a week after the Wall Street Journal article and Andy Main was willing to become CEO if outside investors became supportive of GloriFi.  However, Neugebauer's resignation as CEO was not enough to overcome the damage caused by Defendants (through the Wall Street Journal) and other investors were no longer willing to back GloriFi.  GloriFi announced plans to shut down on November 21, 2022, and filed for bankruptcy on February 8, 2023.

169.     Saving the Company was no longer the RICO Enterprise's intent.  In fact, once the bankruptcy proceedings were initiated, the Defendants continued to seek control of the bankruptcy process and ask for Releases in return for vague promises of further funding.  It is crucial to note that this was not a simple business dispute between Neugebauer and the Defendants as, prior to the investigation, members of the RICO Enterprise only praised Neugebauer for his efforts.  The Defendants' false allegations against Neugebauer drove the Company into bankruptcy as the Defendants launched their competitor companies.

170.     The Wall Street Journal article ended all hopes of raising additional capital.  Even though the employees of GloriFi fought on for another 40 days, it was over.  As the Company was evaluating its bankruptcy options, Porter, Citadel and the RICO Enterprise's lawyer reached out to the sole remaining Board Member, Charlie Hamilton, on Sunday, November 20, 2022.  The Defendants no longer wanted to save GloriFi, but merely to protect themselves.  As such, they sought releases in return for vague promises of further funding to "help" with the bankruptcy that they themselves caused.  Again, controlling the bankruptcy would be the most effective way to manage their liability.  In an effort to distance Citadel, Cason Carter notified Hamilton that Citadel/Griffin sought to transfer its interest in GloriFi to fellow Defendant Rick Jackson.  Hamilton did not approve the transfer, resulting in another attempted breach of the Stockholders Agreement.

**Q.    The Defendants' Timeline of Disparagement and Interference**

171.     This was not a business dispute between Neugebauer and the Defendants.  In fact, Neugebauer gave all of his communications with Defendants to the Wall Street Journal and they were nothing but positive.  The Defendants' actions started before they closed their investment and within 60 days of funding, Ayers was letting a key executive (Landtroop) know of their plans to take over the Company.  Ayers and Findley are hired guns and never would have acted without the

60

full support of their billionaire benefactors.

172.    Within 90 days, the RICO Enterprise members were disparaging and defaming Neugebauer to the CEO of a public traded company (DHC) that had agreed in writing to provide GloriFi with $300 million to execute its business plan.  The Defendants pressured DHC's CEO to join in their plan to take over the Company.  They promised to invest while disparaging Neugebauer behind his back.

173.    Within 120 days, the Defendants were exercising their veto rights and inappropriately blocking[17] all access to much needed capital.

174.    Within 130 days, they were manufacturing explosive and defamatory accusations about GloriFi's CEO, Neugebauer, to the Company's auditor, investment banks and outside corporate counsel.  Not one time did the Defendants offer suggestions or share concerns before starting their attacks.  In fact, just the opposite – they praised Neugebauer and offered their support in the form of promised additional funding for the Company as well as its credit card and insurance operations.

175.    Defendants orchestrated a deliberate and methodical dismantling of GloriFi's prospects.  They never offered constructive feedback.  Their silence was not born out of indifference, but of calculated strategy, revealed through documented correspondence.  Nevertheless, even without such evidence the stark reality remains: the Defendants flagrantly breached the Stockholders Agreement to abstain from using or disclosing GloriFi's Confidential Information, leaving a trail of destruction in their wake.

176.    The story of GloriFi's closure and the damage caused to its 100+ employees is tragic,

---

[17] Plaintiffs do not bring any claim for breach of fiduciary duty as such claim must be pursued by GloriFi's Bankruptcy Estate.

but it is only half of the story.  While those employees were working long hours to create a dynamic new company, the Defendants: (1) ensured GloriFi would not be able to obtain funding necessary for the $1.65 billion SPAC transaction; and (2) invested in, took Board seats on, and/or strategized with various other entities, in which roles they utilized and/or relied on GloriFi's Confidential Information, including its customer acquisition strategy, in violation of Section 5.04 of the Stockholders Agreement.  The Defendants began to invest in and work with Coign, Strive, and Old Glory in violation of the Stockholders' Agreement.  The Defendants' false allegations against Neugebauer drove the Company into bankruptcy as the Defendants launched these competitor companies.

## DEFENDANTS' COMPETING ENTITIES

### I.     Strive: An "Anti-Woke ETF"

177.    After failing to obtain a position as GloriFi's co-CEO, Ramaswamy formed Strive Enterprises, Inc. in early 2022 with his high school friend Anson Frericks, a former executive at Anheuser-Busch.  Based on Frericks' experience, Ramaswamy pitched Strive to Neugebauer as a beer brand focused on American values, similar to the Black Rifle Coffee company (as he mentions in his book, Woke, Inc.).  Ramaswamy also told Neugebauer he planned to start a hedge fund that would pick stocks through active asset management (the opposite of an ETF where an entity merely mirrors a market index for a particular industry).  As GloriFi had no plans for active asset management (or beer products), Neugebauer saw no conflict with Strive and agreed to invest effective March 3, 2022.

178.    However, Ramaswamy pivoted before Strive's public launch in May 2022.  Instead of focusing on a beer brand, Strive changed its name to Strive Asset Management, LLC and launched as an anti-woke asset management company—not focused on active management, as he

had originally proposed to Neugebauer, but stealing the WhiteRock strategy of managing ETFs. On May 10, 2022, the Wall Street Journal ran a story stating that Ramaswamy had "raised $20 million to start a fund manager that would urge companies not to wade into hot-button social or environmental issues."  In fact, Strive was designed to specifically focus on hot-button social and environmental issues from a conversative perspective, asking companies to reject liberal priorities as "short-run social fads."[18]  Just like GloriFi, Ramaswamy designed Strive to appeal to "the vast majority of Americans whose interests are not being well represented."[19]

179.    Interestingly, in the book he published (Woke, Inc.) mere months before Neugebauer described WhiteRock to him, Ramaswamy decried the idea that people would pick investment funds based on social value saying, "[v]ery few retail 'mom and pop' investors in the stock market choose a BlackRock mutual fund over one from Fidelity based on the social values it adopts."  But after gaining access to GloriFi's confidential and proprietary information, Ramaswamy founded Strive to do exactly that–get retail investors to choose a Strive ETF over a BlackRock ETF based on opposition to Black Rock's social values—a confidential and/or proprietary concept he took from GloriFi.

180.    Ramswamy's in-person pitch for Strive utilizes nearly all of GloriFi's Confidential Information including, but not limited to, its customer acquisition strategy.  Indeed, in wording nearly identical to GloriFi's, Ramaswamy pitches Strive by claiming that "most financial institutions have turned their back on the 100 million Americans who care about the actual values this country was founded on."  Based on GloriFi's confidential market research, Ramaswamy

---

[18]  https://www.businesswire.com/news/home/20220810005508/en/Strive-Launches-U.S.-Energy-Index-Fund-DRLL-to-Deliver-a-New-Shareholder-Mandate-to-U.S.-Energy-Companies.
[19] https://twitter.com/StriveFunds/status/1588670852186312704.

recently noted, "those 100 million customers happen to be some of the best customers a financial institution could want. Look at credit risk. Look at savings rate. … no one is serving that 100 million."

181.    Beyond just taking GloriFi's concept of an anti-woke EFT, Strive's signature ETF focused on the energy sector—exactly as GloriFi had proposed.  But while Neugebauer had decades of energy investing experience, Ramaswamy's background was in biotechnology, making it obvious that Strive merely coopted GloriFi's plans.   In fact, taking GloriFi's brand theory, Ramasamy, Thiel, and Lonsdale launched Strive seeking to "mandat[e] US energy companies to produce more oil & gas without apologizing for it."[20]  In other words, Strive publicly launched as the business Neugebauer previously pitched to Ramaswamy as WhiteRock by GloriFi in November 2021.

182.    Ramaswamy's launch of Strive as an anti-woke ETF manager violated the terms of the Stockholders Agreement.  In its May 2022 article, The Wall Street Journal also noted that other Defendants, including Founders Fund, Thiel, and Lonsdale,[21] invested in Strive.  These investments were announced less than a month after Findley, Thiel's appointee to the GloriFi Board was forced out—but while Founders Fund and Lonsdale were still investors in GloriFi and bound by the Stockholders Agreement, which prohibited them from utilizing any of GloriFi's Confidential Information in any way and, for Founders Fund, prohibited it from investing in any entity sharing GloriFi's customer acquisition strategy, whether or not taken from GloriFi, all of which Thiel knew before investing in Strive.

---

[20] https://twitter.com/StriveFunds/status/1557837493688569856.
[21] Thiel and Lonsdale are Defendants in the parallel Georgia proceeding styled, *WPI Collateral Management, LLC, et al. v. Ramaswamy, et al*, C.A. No. 1:24-cv-2148 (N.D. Ga.).(the "Georgia Action")

183.    The Wall Street Journal took time out of its October 2022 hit piece on Neugebauer to continue its free publicity for Ramaswamy and Strive: "Around this time, one of GloriFi's investors, Vivek Ramaswamy, was working to launch his own financial-services firm. Strive Asset Management would offer investors an alternative to firms such as BlackRock Inc., which has pushed companies to improve diversity and cut their climate emissions, among other changes. Strive, instead, would push companies to focus on making money, not taking stands on social or political issues."

184.    Of course, on information and belief, Strive could not have publicly launched its ETFs within a few months of its May 2022 launch without access to resources of the Billionaires as the timeline for a startup company to receive SEC approval on an ETF normally extends for a much longer period.

185.    Strive also plans to cannibalize GloriFi's other ventures, with Ramaswamy telling potential investors that Strive is "going to be expanding to other financial service verticals one at a time. Asset management is where we started. Wealth management is next. Coming up banking, mortgages, investment banking. All in our long term future."  Essentially, Thiel, Lonsdale, Founders Fund, Ramaswamy, and other Defendants intend to utilize all of GloriFi's Confidential Information, including GloriFi's customer acquisition strategy.

## II.    Coign: A "Credit Card for Conservatives"

186.    Zing America, Inc. d/b/a Coign was founded in the Spring of 2022 and headquartered in Washington, D.C..[22]  It bills itself as "a credit card and financial company built

---

[22] https://www.linkedin.com/company/coigncard/about;
https://www.washingtonexaminer.com/news/1910471/ex-senator-and-top-gop-operatives-launch-conservative-credit-card-alternative/.

by Conservatives for Conservatives."[23]  But, Coign's entire credit card model is built off of trade secrets and confidential business information that appears stolen from GloriFi.  In fact, an entity controlled by the Ricketts family, major shareholders in Coign, previously accessed GloriFi's data room, including data related to GloriFi's "We the People" customer acquisition strategy in the Fall of 2021 before knowingly utilizing this stolen data to compete with GloriFi.

187.    As discussed above, GloriFi removed Ayers and Findley from its Board and closed a new round of financing on April 15, 2022.  Then a restaurant in Dallas processed the first transaction on a GloriFi credit card on April 25, 2022.  Only one day later, on April 26, 2022, Coign launched a website with a "coming soon" picture of a credit card virtually identical to GloriFi's card:



188.   Yet while GloriFi actually had a functioning "We the People" credit card on April 25, 2022, Coign did not.  In fact, Coign did not have any functioning credit card until June 2, 2022 and, even then, all they had was a generic red card that said "Coign," with no image of the Constitution:



189.   In retrospect, it appears Defendants told Coign that GloriFi had successfully operationalized its "We the People" card, allowing GloriFi to prepare for a public launch.  Concerned that GloriFi's public launch would preclude Coign from proceeding with its "We the People" campaign, Coign quickly released a web video and sought media coverage in an attempt to publicly demonstrate a "We the People" credit card before any public launch by GloriFi.

190.   On becoming aware of the Coign rip-off card, GloriFi sent it a cease-and-desist letter on May 10, 2022.  Ayers and Moffatt had previously introduced Ricketts to GloriFi as a potential investor and Ricketts (or his designees) accessed the GloriFi data room containing the credit card designs.  Then, on May 18, 2022, Bryan Baker called Neugebauer on behalf of Joe Ricketts, a major investor in Coign, to tell him that he was sorry that Coign stole GloriFi's credit card and asked him not to sue.  For a time, Coign stopped marketing the "We the People" card (that still did not exist in physical form), but quickly began again as GloriFi experienced more financial problems at the direction of the Defendants.

191.   Coign's customer acquisition strategy also mirrored GloriFi's.  For instance, GloriFi's customer acquisition strategy frequently referenced and was built around the "American

Dream" and protecting it from "woke" entities:

**Create a Values Architecture to Drive Messaging:** Freedom & Independence

Protecting the American Dream from the woke mob

- Our active military and veterans, many of whom have paid the ultimate price, provide us the freedom to live, work, worship, and pursue the American dream

**Reward Hustle** - America is great because her people are great. Built on the strong work ethic of immigrants hungry to achieve the American dream, we honor that creative, gritty, bootstrap, get-it-done attitude internally and within our community.

More than just a phrase on our currency, that concept defines us. A melting pot of beautiful cultures, we the people are united in our quest for freedom, independence, and the American dream.

Likewise, Coign marketed by appealing to conservative to "build on the American dream":

Coign works because Conservatives like you are willing to join together to build on the American dream. Certain corporations in America are divisive

192.    GloriFi also emphasized aligning with customers' conservative values in the face of "woke" liberal media and financial institutions:

**Create a Values Architecture to Drive Messaging:** Freedom & Independence

Protecting the American Dream from the woke mob

Cancel culture is vicious – people are being attacked for their beliefs

Americans are tired of being told. We are tired of being told. Told by Wall Street and big tech what's wrong with America — and why we are the problem. Told who we can and cannot vote for. Told what we must believe, and what we can't. That the principles on which this great nation was built, are suddenly unacceptable. Told when we should

193.    Coign proceeded with the same strategy:

## New Conservative Credit Card Alleged to Fight Wokeness

Posted by **Tony Sifert**  April 26, 2022

The appearance of a conservative credit card is a sign of the times, as conservatives have begun to realize that they should no longer give their money to big companies and big banks who hate their values and seek the ruin of their culture.

[24]

# Coign: A credit card for conservatives who want to be heard

### By Rob Collins

https://www.washingtontimes.com/news/2022/may/2/coign-a-credit-card-for-conservatives-who-want-to-/

For years we have seen corporations abandon their responsibilities and their customers in favor of their own economic, political, and social agendas. Woke corporations and their executives have taken the easy route of siding with fringe liberal causes to try and force a socialist reengineering of America. Football, baseball, big tech, Hollywood, and corporate America have teamed up to force-feed to the American people a nonsense agenda that is fundamentally un-American.

[25]

194.    As noted by the Wall Street Journal, GloriFi allowed customers to "earn rewards" to "donate to a charity for veterans and first-responders" and "[i]ts website, adorned with flags,

---

[24] https://headlineusa.com/new-conservative-credit-card-alleged-to-fight-wokeness/.

[25] https://www.washingtontimes.com/news/2022/may/2/coign-a-credit-card-for-conservatives-who-want-to-/.

blue-collar workers and families, urges customers to 'put your money where your values are.'" Similarly, Coign's website features a "charity" page with a picture of an American flag on a rural building and a promise to "donate[] a portion of every transaction you make to support Conservative charities:"[26]



Where GloriFi said, "[p]ut your money where your values are," Coign said, "[w]e align your dollars with your values."

195.    In short, in addition to utilizing GloriFi's Confidential Information, Coign began using the exact same customer acquisition strategies as GloriFi and, based on the terms of the Stockholder Agreement, the Ayers Entities, Founders Fund, and all persons connected them were barred from working with, or investing in, Coign.  Perhaps aware of this very fact, Coign's financial backers have attempted to remain hidden:

**Conservatives Launch Coign, A Visa Card Billed As "America's First Credit Card For Conservatives"**

&#x1F464; Liam Edgar    &#x1F4C5; April 27, 2022

---

[26]https://www.                                                                          HYHWHkf7
d5yJFSv2GWqmUr4Abf2gaIVZiUQf5XeyYqW69YYaAmh3EALw_wcB.

> The card, which was expected to launch on Tuesday, is
> called Coign, which is pronounced "coin," and the
> frontmen have the backing of wealthy, if for now
> ==anonymous, conservative donors.==
>                                                                     [27]

### Ex-Sen. Gardner, Top GOP Operatives to Unveil 'Conservative' Credit Card

> Rob Collins, former executive director of the National
> Republican Senatorial Committee, is launching the "Coign"
> card along with an advisory team that includes Gardner,
> Republican strategist Chris Hansen, Trump ally Matt Lira, ==and
> a pool of anonymous financial backers.==
>                                                                     [28]

To this day, Plaintiffs do not know which of the other Defendants has a financial interest in Coign, but any that do have violated the Stockholder Agreement.

## III.   Old Glory: A Bank for "Freedom, Liberty, Security, Faith, and Family"

196.   As set forth above, on information and belief, Ayers and/or his associates formed Old Glory in March 2021 in Atlanta, Georgia only a few weeks after suggesting the name Old Glory to Neugebauer for the company that became GloriFi.  Then, on March 12, 2022, only two weeks after the Little Rock Meeting where Ayers claimed his co-Defendants would be eliminating

---

[27] https://www.tampafp.com/conservatives-launch-coign-a-visa-card-billed-as-americas-first-credit-card-for-conservatives/.
[28] https://www.newsmax.com/us/woke-corporations-finance-cancel-culture-credit/2022/04/26/id/1067342/.

Neugebauer and giving him control over GloriFi, Old Glory entered into an agreement to purchase a bank in the First State Bank of Elmore, Oklahoma.  The bank purchase would be necessary once the Defendants removed Neugebauer from GloriFi management because GloriFi's previously planned banking application was in Neugebauer's name and the entity pursuing the bank license was wholly owned by Neugebauer and his wife.  Old Glory then changed its legal name to Old Glory Intellectual Property Holdings, LLC on March 18, 2022.

197.    On information and belief, the Defendants planned to use Old Glory as GloriFi's banking arm once they seized control of the Company from Neugebauer.  After the Defendants instigated the October 10, 2022 Wall Street Journal article, the Fed responded by asking Neugebauer to withdraw his application for a bank with intended ties to GloriFi.  Then, on November 4, 2022, the Fed approved Old Glory's acquisition of the Elmore bank.[29]  Old Glory publicly announced that it had cleared all regulatory hurdles on November 16, 2022.[30]  Then, on November 21, 2022, Old Glory sent GloriFi a cease-and-desist letter accusing the Company of trademark infringement.

198.    Like GloriFi, Old Glory targeted customers based on American patriotism and conservative values: "We named ourselves Old Glory Bank because we, too, believe in everything that makes America glorious."  Old Glory even formally adopted the U.S. Constitution as its "Misson Statement" (without any explanation of how a document setting forth the form of the United States government could represent the mission of a bank).  Overall, Old Glory's marketing mirrored GloriFi's and targeted the exact same customers:

---

[29] https://www.federalreserve.gov/releases/h2/20221105/delactions.htm.

[30] https://www.businesswire.com/news/home/20221116005087/en/Old-Glory-Holding-Company-to-Acquire-First-State-Bank-of-Elmore-City-Oklahoma.

> As a bank, we will openly support our country, flag, military, police, and the people we call the engine of America—the hard-working patriots who make this country run every day. If you believe in freedom, liberty, security, faith, and family, we will be your bank. We won't cancel law-abiding customers for their beliefs. We will protect your security and privacy. We support your business and livelihood—regardless of your industry. Whether you're in the oil business, a firearms retailer, or a meat producer, Old Glory Bank will be the bank for you. We stand with you. No matter where you stand.

Accordingly, any Defendants who work with Ayers on Old Glory conspired with him to violate Section 5.04(c) of the Original Stockholder Agreement because Old Glory is "engaged in a business with a similar customer-acquisition strategy" and likely violated Section 5.04(e) of the Amended and Restated Stockholders Agreement as Old Glory likely utilized GloriFi's other Confidential Information.

## CAUSES OF ACTION

### COUNT I
**Breach of Contract and Conspiracy to Breach Contract: Stockholders Agreement**
**(By Plaintiffs Toby Neugebauer and NFE against all Defendants)**

199. Plaintiffs incorporate all of the allegations in Paragraphs 1 to 198 by reference as if fully set forth herein.

**A.    Existence of Contract: the Stockholders Agreement**

200. Plaintiffs NFE and Toby Neugebauer and Defendants Founders Fund, Fadden, Rios, Ayers Investment Entities, Rios, Fadden, Findley, and Amos are all signatories to the Original Stockholders Agreement, that certain Joinder Agreement whereby they agreed to be "bound by and subject to the terms of the [Stockholders] Agreement and (b) adopts the [Stockholders] Agreement with the same force and effect as if Holder were originally a party thereto," and that certain Subscription Agreement whereby each above-listed Defendant acknowledged they had received and read the Stockholders Agreements and had authority to execute it.  Each above-listed Defendant

also owned stock certificates stating, "THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A STOCKHOLDERS AGREEMENT AMONG THE COMPANY AND ITS STOCKHOLDERS."

201.   Defendants Ramaswamy Investment Entity, Citadel Investment Entity, Sprecher Investment Entity, Jackson Investment Entity, Lonsdale Investment Entity, Seven Talents, and Carter are also bound by the Stockholders Agreement because they executed Subscription Agreements acknowledging that they had received and read the Stockholders Agreement and that they would be bound by it when their Convertible Notes converted into GloriFi stock.  All of their Convertible Notes converted to GloriFi stock in April 2022.

### B.   Breach of § 5.04(c) of the Original Stockholders Agreement and § 5.04(e) of the Amended and Restated Stockholders Agreement

202.   With regard the Original Shareholder Agreement, Section 5.04(c) prohibited investors from engaging in any "activity in which the Stockholder contributes the Stockholder's knowledge, directly or indirectly, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity … **engaged in a business with a similar customer-acquisition strategy**."  The prohibition began when a person acquired stock or accepted employment (or a director position) with GloriFi and ended two years after the person ceased employment or no longer had stock ownership.  The Ayers Investment Entities and Founders Fund agreed to that prohibition and violated it by investing in and/or working with Strive, Coign, and Old Glory, which all used a customer acquisition strategy similar to GloriFi and any other Defendants that invested in those entities conspired with them in regard to their violation.

203.   In addition, all Defendants violated Section 5.04(e) of the Amended and Restated

74

Stockholders Agreement whereby all investors agreed:

> not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other Stockholders or stockholders of an Affiliate of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company Group

204.    The Stockholders Agreement broadly defines "Confidential Information" to include "confidential, secret, and proprietary documents, materials, data, and other information, in tangible and intangible form, of and relating to the Company and its Affiliates, businesses and existing and prospective customers, suppliers, investors, and other associated third parties."   GloriFi's Confidential Information included its customer acquisition strategy.

205.    Ramaswamy, Thiel, Founders Fund, Lonsdale,24[31] and possibly other Defendants, all invested in and operated Strive, which utilized a similar customer acquisition strategy with a conservative, pro-American, anti-woke messaging as set forth in paragraphs 177 through 185.  On information and belief, other Defendants also invested in Strive.   Additionally, Defendants wrongfully utilized GloriFi trade secrets, proprietary information, and confidential information in founding Strive, taking GloriFi's concept of an Anti-Woke energy ETF named "WhiteRock" and changing the name very slightly to "Whitestone" before launching in competition with GloriFi.

206.    Ricketts and, on information and belief, Defendants founded and/or made investments in Coign.  Coign misappropriated GloriFi's trade secrets by, among other things,

---

[31] Plaintiffs do not accuse the Lonsdale Investment Entity of breaching Section 5.04(c) of the Stockholders Agreement because Lonsdale struck it from his Investment Entity's' copy of the Stockholders Agreement before executing it.  However, the Lonsdale Investment Entity remains liable for conspiring with other Defendants to assist them in breaching their obligations under Section 5.03(c).  The Lonsdale Investment Entity also remains liable for breach Section 5.04(d) (non-disparagement).

copying GloriFi's credit card design and launched using a similar customer acquisition strategy as set forth in paragraphs 186 to 195.

207.    On information and belief, Ayers and other Defendants formed Old Glory in Atlanta to operate a "pro America" bank in Oklahoma.  As set forth in paragraphs 196 to 198, Old Glory used a similar customer acquisition strategy as GloriFi and likely utilized GloriFi's other Confidential Information.

### C.    Breach of § 5.04(d) of the Stockholders' Agreement

208.    Under Section 5.04(d) of the Stockholders Agreement, each stockholder agreed that they would not "make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Company Group or its businesses, or any of its employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties." As set forth above, each of the Defendants violated Section 5.04(d) of the Stockholders Agreement by disparaging or conspired to disparage Neugebauer (GloriFi's CEO) to:

- GloriFi senior executives;

- GloriFi's investment bankers at Moelis;

- GloriFi's SPAC merger partner, DHC;

- GloriFi's auditors, Crow;

- GloriFi's corporate counsel, Winston & Strawn;

- Locke Lord during its investigation of GloriFi;

- Potential investors including, but not limited to, Washburn, Omeed, and Trinity Broadcasting Network; and

- The Wall Street Journal.

Defendants were not trying to prevent people from doing business with GloriFi, they were trying to prevent people from doing business with Neugebauer so he would have to give them GloriFi. Defendants' actions ultimately led to the closure of GloriFi, and their disparagement destroyed Neugebauer's reputation and personal brand as an investment professional.

**D.     All Defendants Conspired With Those Breaching the Stockholders Agreement**

209.    All Defendants conspired with each other and third-parties including, but not limited to, Ayers, Lonsdale, Ramaswamy, Citadel, Thiel, Ricketts, Sprecher, and Jackson, in violating *the signatories'* obligations under the Stockholders Agreement.

210.    Defendants reached at least three agreements as part of their conspiracy, each of which both: (1) violated the Stockholders Agreement; and (2) included independently tortious conduct.  First, Defendants agreed to embark on a campaign of defamation against Neugebauer to GloriFi's senior leadership, outside counsel, investment bank, auditors, and potential investors to force him to give them GloriFi.  Second, Defendants conspired to prevent GloriFi from obtaining addition financing necessary to complete the SPAC transaction through defamation and unfair competition.  Third, Defendants to compete with GloriFi by creating, investing in, or otherwise assisting other entities utilizing GloriFi's trade secrets and through other means of unfair competition including, but not limited to, use of GloriFi's confidential and proprietary information.

211.    Accordingly, all Defendants are jointly and severally liable for damages sustained as a result of the breaches of contract as set forth below.

**E.     Plaintiffs Have Suffered Damages in Excess of $100 Million**

212.    The Neugebauer Parties have all been damaged by Defendants' actions.  The two

Banzai Entities and NFE lost the money they loaned to GloriFi.[32]  As set forth above, Neugebauer built a career on raising money from institutions and high net worth individuals and investing that money in successful ventures.  Prior to GloriFi, Neugebauer was one of a select group of people/companies who could obtain hundreds of millions of dollars of investment dollars from institutional investors because of his exceptional track record.

213.    Citadel, Founders Fund, Ramaswamy, and Lonsdale are all in the alternative investments business including the private equity and venture capital businesses.  Their customers, and the source of their income, are the world's largest pools of capital, such as sovereign wealth funds, state employee pensions, insurance companies, endowments, and foundations.  The ability to attract and retain this capital is based solely on the trust and confidence these funds have in the leadership of the people who manage these pools of capital.  Neugebauer spent his whole career earning their trust as the co-founder of one of the world's largest and most successful energy private equity firms: Quantum Energy Partners.  Neugebauer served these investors exceptionally well: not one of the companies that Quantum invested in with Neugebauer on the portfolio company Board ever lost money and Quantum generated unparallelled investment return performance.

214.    The Defendants' actions in breaching the Stockholders Agreement destroyed both Neugebauer's track record and reputation.  Essentially, he can no longer make money in his chosen career of financial services and investments.  Defendants' disparagement destroyed Neugebauer's ability to successfully raise capital on future ventures and has cost him hundreds of millions of dollars in lost income.

---

[32] All GloriFi stockholders, including Plaintiffs, have also lost the value of their GloriFi stock due to Defendants' actions, but Plaintiffs do not seek to recover any damages for lost equity value in this case as such damages must be pursued by the GloriFi Bankruptcy Estate.

215.    In fact, in perverse irony, while no one should be pursuing GloriFi's ideas and strategies in violation of the Stockholder Agreements, Neugebauer is the only person that cannot pursue them as a matter of law and regulation.  So while the Defendants capitalize on GloriFi's stolen property, Neugebauer faces essentially a "lifetime ban."   For instance, Neugebauer spent more than ten years working on the acquisition of a bank, finally entering into a contract for Citizens Bank of Ganado in June 2021.  After a rigorous review by the banking regulators, the acquisition was set for final approval by the head of the Texas Department of Banking the week that the Wall Street Journal published its hit piece.  That timing was not an accident.  Now, as the CEO of an entity that went bankrupt, Neugebauer is disqualified from ever owning a bank or serving on the Board of a bank.

216.    Likewise, during the same time period, Neugebauer was seeking approval for state insurance licenses.  But many states prohibit issuing such licenses to CEO's whose former companies have declared bankruptcy.  As a result, Neugebauer will never again be able to launch a nationwide insurance platform.

217.    Overall, Neugebauer has lost at least tens of millions of dollars in future income as the former CEO of a financial entity that declared bankruptcy because he can no longer: (1) be the owner, officer, or director of a bank; (2) have an insurance license; (3) run a mortgage business; or (4) operate a broker-dealer entity.  His credit has been impaired (despite his flawless personal credit history) from his association with a bankrupt company, causing him to have difficulty obtaining credit and/or causing him to pay higher interest rates on debt.

**COUNT 2**
**Violations of RICO: 18 U.S.C. § 1962(c)**
**(By Toby Neugebauer Against All Defendants)**

218.    Plaintiffs incorporate all of the allegations in Paragraphs 1 to 198 by reference as if fully set forth herein.

219.    The RICO Enterprise consists of an association and group of individuals associated in fact (the Defendants, the Billionaires, and the Billionaire Agents) for the unlawful purposes of defaming and disparaging Neugebauer so people would not do business with him and he would give them GloriFi; and (2) stealing GloriFi's confidential and proprietary information and knowingly using the stolen information to compete against GloriFi, all of which through engagement in, and activities affecting, interstate commerce.  The Defendants are among the persons associated with the RICO Enterprise.

220.    The Defendants agreed to and did conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity by:

- Transmitting disproven allegations about Neugebauer to the Wall Street Journal in wire transmissions across state lines in violation of 18 U.S.C. § 1343;

- Sending emails to Locke Lord with untrue allegations about Neugebauer for the fraudulent purpose of damaging him to interfere with GloriFi's fundraising ability in violation of 18 U.S.C. § 1343;

- Filing a false police report about Neugebauer as a means to extort him to give up GloriFi in violation of 18 U.S.C. § 1951;

- Illegally downloading GloriFi's confidential and/or proprietary data on or around Nov. 9, 2021, with intent to convert it for the RICO Enterprise's benefit in interstate commerce in violation of 18 U.S.C. § 1343 and § 1832;

- Illegally downloading GloriFi's confidential and/or proprietary data on or around October 2, 2022, with intent to convert it for the RICO Enterprise's benefit in interstate commerce in violation of 18 U.S.C. § 1343 and § 1832;

- Copying GloriFi's credit card for the benefit of Coign and its owners, who used it in

80

interstate commerce in violation of 18 U.S.C. § 1832;

- Converting GloriFi's trade secrets for the benefit of Strive and its owners, who used it in interstate commerce in violation of 18 U.S.C. § 1832;

221.    As set forth above, and pursuant to and in furtherance of their fraudulent scheme,

Defendants committed multiple related acts of:

- Transmitting writings in interstate commerce for the purpose of furthering a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343; and

- Knowingly stealing or fraudulently obtaining or downloading without authorization or knowingly receiving and/or possessing such information obtained without authorization or attempting to do so or conspiring with others to do so in violation of 18 U.S.C. § 1832.

- Obstructing, delaying, and/or affecting commerce through threats of extortion in violation of 18 U.S.C. § 1951;

The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

222.    The Defendants have directly and indirectly conducted and participated in the

conduct of the enterprise's affairs through the pattern of racketeering and activity described above,

in violation of 18 U.S.C. § 1962(c).  The Defendants also used their pattern of racketeering activity

to damage Neugebauer for the purpose of acquiring or maintaining control, directly or indirectly,

any interest in or control of GloriFi, which was engaged in or whose activities affected interstate

commerce in violation of 18 U.S.C. § 1962(b).

223.    As a direct and proximate result of the Defendants' racketeering activities and

violations of 18 U.S.C. § 1962(b) and (c), Plaintiffs have also been injured in that Plaintiffs would

not have loaned tends of millions of dollars to GloriFi had they known Defendants were in the

process of misappropriating GloriFi's Intellectual Property through their actions in violation of

RICO.  To the contrary, Plaintiffs knew that Defendants had signed agreements prohibiting them

from using or disclosing GloriFi's Intellectual Property before they loaned money to GloriFi. Plaintiffs seek to recover the money loaned to GloriFi in reliance on the good faith of Defendants.

224.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b) and (c), Neugebauer has been injured in his business and property in that he lost his ability to make money in his chosen field as set forth in paragraphs 212 through 217.

225.    Plaintiffs seek judgment under this count for actual damages, treble damages, disgorgement of profits earned by each Conspirator, and attorneys' fees.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that: (i) judgment be entered in their favor, (ii) that judgment be entered against all Defendants, and (iii) relief be granted as follows:

    a.  Compensatory damages in an amount to be determined at trial including lost investment, interest, penalties and fees;

    b.  Treble damages under RICO;

    c.  Personal damages to Neugebauer in excess of $100,000,000;

    d.  That the Court award Plaintiffs the costs and expenses of this action, including their reasonable attorneys' fees and any other reasonable professional or expert fees which may be incurred; and

    e.  That the Court grant such other and further relief as the Court deems just and proper under the circumstances.

Dated: May 17, 2024                    **ARMSTRONG TEASDALE LLP**

By: */s/ Jonathan M. Stemerman*
Jonathan M. Stemerman, Esq. (No. 4510)
1007 North Market Street, 3rd Floor
Wilmington, DE 19801
Telephone: (302) 416-9670
Email: jstemerman@atllp.com

-and-

Ryan Downton (*pro hac to be filed*)
THE TEXAS TRIAL GROUP, P.C.
875 Carr 693, Ste. 103
Dorado, PR 00646
Telephone: (512) 680 7947
Email: ryan@thetexastrialgroup.com

*Attorneys for Plaintiffs Toby Neugebauer, Neugebauer Family Enterprises, LLC, Banzai Capital Partners, LLC, and Banzai Advisory Group, LLC*